No. 23-1175

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____

EDGEWOOD HIGH SCHOOL OF THE SACRED HEART, INCORPORATED,

*Plaintiff-Appellant,*

v.

CITY OF MADISON, WISCONSIN, CITY OF MADISON ZONING BOARD OF APPEALS,
CITY OF MADISON PLAN COMMISSION AND
CITY OF MADISON COMMON COUNCIL,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Western District of Wisconsin
The Honorable William M. Conley, Presiding
Case No. 3:21-cv-00118-wmc

_____

## BRIEF AND APPENDIX OF DEFENDANTS-APPELLEES

_____

<div style="text-align:right">

Sarah A. Zylstra
 *Counsel of Record*
Tanner G. Jean-Louis
BOARDMAN & CLARK LLP
1 South Pinckney Street
Suite 410
P.O. Box 927
Madison, WI 53701-0927
(608) 257-9521
szylstra@boardmanclark.com
tjeanlouis@boardmanclark.com
*Counsel for Defendants-Appellees*

</div>

May 1, 2023

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1175

Short Caption: Edgewood High School of the Sacred Heart, Incorporated v. City of Madison, Wisconsin, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

City of Madison, Wisconsin, City of Madison Zoning Board of Appeals, City of Madison Plan Commission, and

City of Madison Common Council

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Boardman & Clark LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Sarah A. Zylstra    Date: March 30, 2023

Attorney's Printed Name: Sarah A. Zylstra

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ✔ No ☐

Address: One South Pinckney Street, P.O. Box 927

Madison, WI 53701-0927

Phone Number: 608-257-9521    Fax Number: 608-283-1709

E-Mail Address: szylstra@boardmanclark.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1175

Short Caption: Edgewood High School of the Sacred Heart, Incorporated v. City of Madison, Wisconsin, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

<br>

       ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

     City of Madison, Wisconsin, City of Madison Zoning Board of Appeals, City of Madison Plan Commission, and

     City of Madison Common Council

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

     Boardman & Clark LLP

(3)     If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

         N/A

     ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

     N/A

---

Attorney's Signature: /s/ Tanner G. Jean-Louis     Date: March 30, 2023

Attorney's Printed Name: Tanner G. Jean-Louis

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑   **No** ☐

Address: One South Pinckney Street, P.O. Box 927

     Madison, WI 53701-0927

Phone Number: 608-257-9521     Fax Number: 608-283-1709

E-Mail Address: tjeanlouis@boardmanclark.com

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................. 1

STATEMENT OF THE ISSUES ................................................................... 1

STATEMENT OF THE CASE ...................................................................... 1

I.    Introduction ................................................................. 1
II.   Background ..................................................................... 3

    A. Edgewood and its zoning history ........................................ 3
    B. Creation of the Campus Institutional District Zoning ..................... 3
    C. Edgewood voluntarily submits a master plan ............................... 5
    D. Edgewood receives a $1.025 million grant to improve its field ........ 7
    E. The City reminds Edgewood that its Master Plan does not
       allow lights ............................................................ 8
    F. Edgewood applies to amend its Master Plan ............................... 9
    G. Edgewood submits lighting application for night games ............... 10
    H. Complaints about Edgewood violating its master plan ................... 12
    I. Amendment to CI-District Ordinance to address flaw ................... 13

SUMMARY OF ARGUMENT ................................................................. 16

ARGUMENT ............................................................................. 17

I.    Edgewood Was Not Treated Less Equally Than Other Institutions ... 17

    A. The City did not violate RLUIPA's equal terms provision by
       interpreting the Master Plan to prohibit athletic contests ........... 19
    B. Memorial is not a similarly situated comparator ...................... 22
    C. UW-Madison is not a similarly situated comparator .................... 28
    D. Edgewood lacks a similarly situated comparator for
       denial of its lighting permit ......................................... 29

II.   Edgewood Has Not Met Its Burden To Show That Its Free
    Exercise Of Religion Has Been Substantially Burdened .................... 32

    A. Edgewood cannot show more than a mere inconvenience .............. 32
    B. The permit denial was not absolute .................................... 39
    C. Edgewood must, but cannot, show any arbitrary or bad faith
       action of the City for its undue expense argument .................... 40
    D. The District Court's decision did not turn on animus ................... 43

III.  Like Its RLUIPA Claim, Edgewood's Free Exercise Claim Fails ........ 44

III.    Edgewood Does Not Have A Vested Right To Install
Stadium Lights ..................................................................... 49

CONCLUSION ................................................................................. 53

CERTIFICATION OF COMPLIANCE WITH F.R.A.P. RULE 32(a)(7) ................... 55

CERTIFICATE OF SERVICE ............................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Affordable Recovery Hous. v. City of Blue Island*,
   No. 12-CV-4241, 2016 WL 5171765 (N.D. Ill. Sept. 21, 2016) ............................... 32

*Andon, LLC v. City of Newport News, Va.*,
   813 F.3d 510 (4th Cir. 2016) ......................................................................... 38

*Barnhart v. Peabody Coal Co.*,
   537 U.S. 149 (2003) ..................................................................................... 29

*Beaulieu v. City of Alabaster*,
   454 F.3d 1219 (11th Cir. 2006) ..................................................................... 29

*C.L. for Urb. Believers v. City of Chicago*,
   342 F.3d 752 (7th Cir. 2003) .................................................................. 21, 42

*Christian Assembly Rios De Agua Viva v. City of Burbank, Illinois*,
   237 F. Supp. 3d 781 (N.D. Ill. 2017) ................................... 21, 27, 38, 41

*City of Milwaukee v. Leavitt*,
   31 Wis. 2d 72, 142 N.W.2d 169 (1966) ......................................................... 52

*Dorman v. Aronofsky*,
   No. 20-10770, 2022 WL 2092855 (11th Cir. June 10, 2022) ..................... 33

*Eagle Cove Camp & Conf. Ctr., Inc. v. Town of Woodboro, Wis.*,
   734 F.3d 673 (7th Cir. 2013) .................................................................. 18, 42

*Foster v. PNC Bank, Nat'l Ass'n*,
   52 F.4th 315 (7th Cir. 2022) ......................................................................... 18

*Fulton v. City of Philadelphia, Pennsylvania*,
   141 S. Ct. 1868 (2021) .......................................................................... 45, 46, 47

*Golden Sands Dairy LLC v. Town of Saratoga*,
   2018 WI 61, 381 Wis. 2d 704, 913 N.W.2d 118 ......................................... 49

*Grace United Methodist Church v. City of Cheyenne*,
   451 F.3d 643 (10th Cir. 2006) ..................................................................... 49

*Grycowski v. Milwaukee Employees' Ret. Sys./Annuity & Pension Bd.,*
 2021 WI App 7, 395 Wis. 2d 722, 953 N.W.2d 904 ................................. 30

*Immanuel Baptist Church v. City of Chicago,*
 344 F. Supp. 3d 978 (N.D. Ill. 2018) ....................................... 19

*Irshad Learning Ctr. v. Cnty. of DuPage,*
 804 F. Supp. 2d 697 (N.D. Ill. 2011) ....................................... 48

*Lake Bluff Hous. Partners v. City of S. Milwaukee,*
 197 Wis. 2d 157, 540 N.W.2d 189 (1995)................................... 49, 50

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch,*
 510 F.3d 253 (3d Cir. 2007)................................................. 46, 48

*Living Water Church of God v. Charter Twp. of Meridian,*
 258 F. App'x 729 (6th Cir. 2007)............................................ 33, 36, 37

*Livingston Christian Sch. v. Genoa Charter Twp.,*
 858 F.3d 996 (6th Cir. 2017) ............................................... 36

*Marianist Province of United States v. City of Kirkwood,*
 944 F.3d 996 (8th Cir. 2019) ............................................... 35, 37

*Meinholz, LLC v. Dane Town Bd. of Zoning Appeals & Adjustment,*
 2022 WI App 30, 978 N.W.2d 88........................................... 49, 52

*Midrash Sephardi, Inc. v. Town of Surfside,*
 366 F.3d 1214 (11th Cir. 2004) ............................................ 35, 37

*River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.,*
 611 F.3d 367 (7th Cir. 2010) ........................................ 18, 25, 27, 31

*San Jose Christian Coll. v. City of Morgan Hill,*
 360 F.3d 1024 (9th Cir. 2004) ............................................. 35

*Schlemm v. Wall,*
 784 F.3d 362 (7th Cir. 2015) ......................................... 18, 33, 44

*Shaw v. Cnty. of Milwaukee,*
 No. 22-C-97, 2022 WL 1063726 (E.D. Wis. Apr. 8, 2022) ...................... 33

*State v. Delaney,*
 2003 WI 9, 259 Wis. 2d 77, 658 N.W.2d 416 ................................ 29

*Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin,*
 396 F.3d 895 (7th Cir. 2005) .............................................. 40, 41

*Swanson v. Nelson*,
No. 96-1693, 1997 WL 64318 (Wis. Ct. App. Feb. 18, 1997)................................ 50

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021) ........................................................................... 45

*Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*,
905 F.3d 357 (6th Cir. 2018) ......................................................... 19, 26

*U.S. v. Glaser*,
14 F.3d 1213 (7th Cir. 1994) ............................................................ 48

*United States Fire Ins. Co. v. E.D. Wesley Co.*,
105 Wis. 2d 305, 313 N.W.2d 833 (1982)............................................ 50

*Vision Church v. Vill. of Long Grove*,
468 F.3d 975 (7th Cir. 2006) ...................................................... 18, 27, 44

*Westchester Day Sch. v. Vill. of Mamaroneck*,
504 F.3d 338 (2d Cir. 2007)............................................................. 40

*Willow Creek Ranch, L.L.C. v. Town of Shelby*,
2000 WI 56, 235 Wis. 2d 409, 611 N.W.2d 693 ................................. 30, 52

*World Outreach Conf. Ctr. v. City of Chicago*,
591 F.3d 531 (7th Cir. 2009) ......................................................... 32, 46

*Young v. McKee*,
No. 2:17-CV-23, 2019 WL 5273963 (W.D. Mich. July 16, 2019)............................ 33

## Other Authorities

1 Am. Law. Zoning §9:20 (5th ed.) ............................................................ 23

M.G.O. §10.085 ..................................................................................*passim*

M.G.O.§28.097 ....................................................................................*passim*

## JURISDICTIONAL STATEMENT

Appellant Edgewood High School of the Sacred Heart, Incorporated's ("Edgewood") Jurisdictional Statement is correct.

## STATEMENT OF THE ISSUES

1.     Did Edgewood fail to show that the City's enforcement of Edgewood's Master Plan and its denial of a permit to install 80-foot stadium lights for its football field violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA")?

2.     Did the District Court correctly dismiss Edgewood's Free Exercise claim after determining Edgewood's RLUIPA claim was without merit and Edgewood admits that the City's conditional use ordinance is facially neutral?

3.     Did the District Court correctly determined that Edgewood did not have a "vested right" to install stadium lights for its football field when its lighting application did not fully and strictly comply with the City's ordinances?

## STATEMENT OF THE CASE

### I.     Introduction

Edgewood has long desired field lighting and a sound system to hold night games on its athletic field. However, Edgewood is surrounded by residential property and its neighbors have vehemently opposed any proposal that could spill light or amplified sound into their homes. Two neighborhood associations have actively mobilized residents against Edgewood's successive proposals for lights, dating back to the 1990's.

After Edgewood received a grant to upgrade its athletic track and field, it pursued a stadium with new vigor, but unlucky for Edgewood, prior to the grant,

1

Edgewood entered into a ten-year Master Plan with the City and promised neighbors to limit use of the field to practices and physical education classes. Further, Edgewood was required to identify its current and future uses of its open space and the capital improvements it would undertake during the ten-year plan. Edgewood undisputedly admits that installing lights and a sound system were not among the improvements identified nor were athletic contests identified as a current use. As a result, Edgewood needed to obtain City approval through a process affording Edgewood's neighbors the opportunity to object.

The history of Edgewood's request for stadium lights and the opposition by the neighborhood associations is long, but the upshot is that in January 2021, the City's Plan Commission heard Edgewood's conditional use application for the installation of lights on its athletic field. In the face of the voluminous submissions, including sound studies, environmental impacts, and testimony about the negative impact to the neighbors, the Plan Commission determined that Edgewood's proposal failed meet the ordinance's requirement that uses, values, and enjoyment of surrounding properties not be substantially impaired. The Plan Commission stated it would be open to considering the request again if Edgewood addressed the noise impacts and improved engagement with the neighborhoods. Instead, Edgewood appealed to the Common Council, who affirmed the decision.

Unhappy that it cannot have Friday Night Lights for its football team, Edgewood searched for a new way to get its lights in this residential neighborhood— and landed on suing the City contending religious discrimination under RLUIPA and

the Free Exercise clause, as well as a "vested right" to a permit. But the City has not treated a similarly-situated secular institution more favorably and declining to allow Edgewood to install stadium lights in a residential neighborhood does not substantially burden Edgewood's ability to practice its Catholic faith. Further, Edgewood's "vested rights" claim is a non-starter because its lighting application fails the pivotal requirement that it comply with its Master Plan.

## II.     Background

### A.     Edgewood and its zoning history

Edgewood is a Catholic high school in Madison, Wisconsin. (R.45, ¶1). Edgewood Campus is nestled between two residential neighborhoods, Vilas and Dudgeon Monroe. (R.45, ¶¶45-48, 55). Edgewood and its neighbors have occasionally been at odds over new development on campus. Up until 2013, Edgewood itself was zoned residential. (R.45, ¶¶6, 17-18). Under its residential zoning, Edgewood was required to obtain a conditional use permit for new development. (R.45, ¶¶5-6). This required review by administrative and political bodies that permitted neighbors to object. (R.45, ¶¶6-8, 28). In 1996, Edgewood proposed to the neighborhood association a conditional use plan that included plans for Edgewood to add lights, a sound system, and a grandstand to its athletic field, but the neighborhood association objected, and Edgewood did pursue that request. (R.45, ¶¶73-75).

### B.     Creation of the Campus Institutional District Zoning

Around 2007, Edgewood, the University of Wisconsin-Madison ('UW-Madison') and Madison College approached the City about creating a better, more predictable path for approval of their building expansions outside of the high stakes pass/fail of

the conditional use permit process. (R.45, ¶¶5-8). At that time, whenever these institutions wanted to make changes to a building or open spaces such as adding a parking lot, the institution had to prepare a conditional use permit application. (R.45, ¶6). After review by the City staff, the application would go before the City's Plan Commission at a public hearing, where the public could weigh in before the Commission voted. (R.45, ¶7). These institutions believed that the detail, expense, and effort involved in preparing a conditional use application for a building that could be denied was relatively inequitable, and so they asked the City to create a better path. (R.45, ¶8).

As a result, on January 2, 2013, the City of Madison enacted M.G.O. §28.097 ("CI-District ordinance"). (R.45, ¶¶5-9). Its purpose is:

(1) Statement of Purpose

The Cl District is established to recognize the City's major educational and medical institutions as important activity centers and traffic generators, accommodate the growth and development needs of these institutions, and coordinate the master plans of these institutions with the City's plans, policies and zoning standards. The district is also intended to:

(a) Permit appropriate institutional growth within boundaries while minimizing the adverse impacts associated with development and geographic expansion.

(b) **Balance the ability of major institutions to change** and the public benefits derived from change **with the need to protect the livability and vitality of adjacent neighborhoods**.

(c) **Encourage the preparation of Campus Master Plans that enable adjacent neighborhoods and the broader community to understand the levels of development**

4

> *being proposed, their likely impacts, and appropriate*
> *mitigation measures*.

(Res.-App'x_0001) (emphasis added).

Master plans were voluntary for existing educational and medical institutions, but mandatory for any new institutions created after the passing of the ordinance. (R.45, ¶11). Edgewood and UW-Madison were the only two institutions that voluntarily decided to adopt a master plan. (R.45, ¶204).

For institutions like Edgewood that chose to adopt a master plan, the ordinance required submission of a facilities plan with existing and proposed conditions for improvements. (Res.-App'x_0004). And, the Common Council would approve or reject the Master Plan following a recommendation by the Plan Commission. (*Id.*).

A master plan, once approved, became an enacted ordinance of the City. (R.45, ¶¶15, 127). Any master plan was effective for ten years. (R.45, ¶¶16, 127).

### C.    Edgewood voluntarily submits a master plan.

In 2013, Edgewood began working with the two neighborhood associations to prepare its Master Plan. (R.45, ¶¶13, 36-48). Edgewood's president Mike Elliott understood that it was important for Edgewood to get agreement with the neighborhood associations on the plan. (R.45, ¶¶38-39). As the Master Plan itself stated, "[t]he final master plan [was] the product of extensive engagement, collaboration and effort" between Edgewood and its neighbors. (R.45, ¶45). The possibility of sound or light spilling over from Edgewood to the surrounding properties was a frequent topic of discussion. (R.45, ¶¶39-43).

Edgewood's Master Plan identified 22 improvements that the Edgewood Campus would make during the ten-year period of the Plan.[1] The 22 projects were not limited to building improvements but included existing open spaces and outdoor projects such as parking lots. (R.45, ¶32). None of the identified projects involved improvements to an athletic field. (R.45, ¶33).

Under the City's CI-District ordinance, Edgewood's Master Plan was required to include:

(c) ... a description of existing conditions on the campus and the proposed conditions under the Master Plan, including:

1. Existing Conditions.
    a. *Land uses* and buildings.
    b. Building form (building type, height, bulk, etc.).
    c. Landmarks, historic sites and districts.
    d. Natural features and significant *open-space areas*.

2. Proposed Conditions.
    a. Future needs/capital improvements.
    b. Phasing of proposed improvements.
    c. *Future land uses* and buildings.
    d. Building Form (building type, height, bulk, etc.).
    e. *Landscape treatment*.
    f. *Open-space areas and other open-space uses*.
    g. Relationship to transportation/access plan (parking, transportation demand management, etc.).

(Res.-App'x_0004)(emphasis added).

Edgewood identified its open-space areas in Section 3.8 of its Master Plan. (R.45, ¶35). Among the open spaces was a site now known as the Goodman Athletic Field. (R.45, ¶¶35, 225). The plan described this field as: "Athletic field owned by

---

[1] Edgewood's Master Plan applied to the entire Edgewood campus, which included Edgewood College, Edgewood High School, and the grade school. (R.45, ¶¶2, 29).

Edgewood High School. Used for team practices, physical education classes." (R.45, ¶35). A prior draft of the Master Plan described the field as "Athletic field owned by Edgewood High School. Used for team practices, physical educations classes, **and other general light uses**." (R.45, ¶44) (emphasis added). The "and other general light uses" language was removed prior to Edgewood submitting its final Master Plan. (R.45, ¶44).

Edgewood submitted its Master Plan in January 2014. (R.45, ¶18). The City approved its Master Plan, subject to conditions, and explained that:

> No alteration of an approved Campus Master Plan, ***including changes to the proposed use of identified open space areas and other open space uses, shall be permitted unless approved by the Plan Commission***, provided however, the Zoning Administrator may, following consideration by the alderperson of the district, issue permits for minor alterations that are approved by the Director of Planning and Community and Economic Development and are consistent with the concept approved by the Common Council. If the change or addition constitutes a substantial alteration of the original plan, the procedure in Sec. 28.097(2) is required.

(R.45, ¶¶21-24). This language was nearly verbatim of language in M.G.O. §28.097. (*Id.*; Res.-App'x_0005-0006). Edgewood completed its conditions of approval, and its Master Plan went into effect on November 6, 2015. (R.45, ¶¶22-23).

### D.    Edgewood receives a $1.025 million grant to improve its field.

In June 2015, Edgewood received a $1.025 million grant to upgrade its track and field. (R.45, ¶49). In a newspaper article, Edgewood's President Elliott noted the grant would be used for improvements "in the practice facilities" for Edgewood's sport teams and for physical education classes. (R.45, ¶¶51-52, 55). Notably, the article continued: "According to Elliott, the project has received the support of area

neighborhood groups that have balked in the past at the idea of turning the facility into a competition site for Edgewood's many athletic programs." (R.45, ¶54). Elliott said that "We're between two neighborhood associations. They have been vehemently opposed to us having *lights or playing games here*," and that Edgewood was building the new facility to host outdoor *practices*. (R.45, ¶55) (emphasis added).

### E.   The City reminds Edgewood that its Master Plan does not allow lights.

Around March 2017, Elliott had a meeting with the City's then Zoning Administrator Matthew Tucker about Edgewood's desire to construct a modified stadium at the site of its athletic field. (R.45, ¶76). Elliot wrote in an email after that meeting that the City did "not feel the current master plan would let us proceed with a modified stadium. Night use is the issue and it is in their mind a new or different usage. They [recommend] we continue to work with neighbors for an agreement." (R.45, ¶77). Tucker suggested that Edgewood work with neighbors to mitigate sound and noise associated with night games. (R.45, ¶77).

Edgewood has typically played its football games at Breese Stevens field (a City park) or in Middleton. (R.45, ¶187). Elliot is not aware of any instances where the City ever precluded Edgewood from using the City's fields when available. (R.45, ¶191). Elliott admits that for the most part, Edgewood's football program has been able to play night games at other venues. (R.45, ¶192). Elliott is not aware of Edgewood ever securing a field for nighttime use for any activities other than sports. (R.45, ¶194).

Madison West High School ("West") is a competitor of Edgewood. (R.45, ¶195). West has an athletic field on site, but it does not have lights. (R.45, ¶196). West plays its night games off-site at Memorial High School's ("Memorial") home field. (R.45, ¶197).

On October 17, 2018, Tucker attended a neighborhood meeting that included a presentation of Edgewood's proposal to add seating, lights and a sound system to its athletic field. (R.45, ¶¶81-82). Edgewood's presentation described the school's then current use of the field for competition games, which had expanded since the 2015 renovation. (R.45, ¶82). Following that meeting, Tucker sent an email to Elliott stating that he had become aware of the extensive use of the athletic field for athletic contests, had reviewed Edgewood's Master Plan, and that the current use was inconsistent with the Master Plan, which identified the field as being used for "team practices, physical education practices." (R.45, ¶83). Tucker told Edgewood that he believed it needed to amend its Master Plan to host competitive games. (*Id.*)

### F.    Edgewood applies to amend its Master Plan

On November 14, 2018, Edgewood followed Tucker's recommendation and filed an application to amend its Master Plan that incorporated lighting, expanded seating, added restrooms, and defined its field use to include athletic competitions. (R.45, ¶85). That same day, Edgewood wrote to Tucker, disputing amendment was needed. (R.45, ¶¶86-87). Tucker responded disagreeing but stating that since Edgewood had filed an amendment to its Master Plan that, if approved, would moot

the issue, the City's internal policy was to suspend enforcement pending the result of the amendment. (R.45, ¶¶88-90).

### G.    Edgewood submits lighting application for night games.

On February 22, 2019, Edgewood submitted an application for outdoor lighting of its athletic field. (R.45, ¶91). This was a surprise to the City as Edgewood had submitted a master plan amendment. (R.45, ¶91). On February 27, Tucker wrote a letter to Elliott:

> On Friday, February 22, the Building Inspection Division accepted a lighting plan … to install lighting for the school's field. Those plans will be reviewed for compliance with MGO Section 10.085, and if the plans comply, electrical permits will be issued when requested.

> The City **believes** this permit can be issued without requiring amendment of the approved 2014 Master Plan. However, over the past weekend, I received a copy of the letter sent to "Edgewood Family" … (copy attached). ***These letters indicate that Edgewood intends to use the lights and sound system to host night games at the facility.***

> Based on the information the City currently has regarding the historical use of the facility, ***it would appear that the intended use of the facility as outlined in your letter … would conflict with the approved 2014 Master Plan for the site***, which limits use of the facility to "team practices, physical education classes" (Page 42, Section 3.8, Open Spaces Plan).

> The purpose of this letter is to inform you that the issuance of any lighting permit under MGO sec. 10.085 does not change the City's position that the use of the facility under the master plan is limited to "team practices, physical education classes."

(R.45, ¶92) (emphasis added). The attachment that Tucker referenced also stated that Edgewood was tabling the application to amend its Master Plan. (R.45, ¶¶93-94).

Also on February 27, Edgewood's lighting application was marked "approved" by City Building Inspector Steve Rewey. (R.45, ¶95). Rewey's review of the

application was limited to compliance with the technical components of Madison's lighting ordinances, not Edgewood's Master Plan. (*Id.*) Edgewood did not take any action to install lights on its field. (R.45, ¶115).

Shortly after Tucker sent this letter, he met with his supervisor, George Hank, who was the Director of the Building Inspection Department. (R.45, ¶96). Hank indicated that the lighting permit should not issue based on M.G.O. §10.085(1) and (5)(b). (R.45, ¶97). Specifically, M.G.O. §10.085(1) provided in part, "Installation of outdoor lighting is not mandatory, but if installed, it shall be in conformance with the provisions of the ordinance, the building code, ***and all other codes and regulations*** as applicable under appropriate permit and inspection." (Res.-App'x_0007) (emphasis added); (*see also* §10.085(5)(b) providing "Upon review of the material described above, the building inspection division *may* authorize the installation of outdoor lighting fixtures."). Hank believed that the language of Edgewood's Master Plan was inconsistent with its lighting application and was concerned that allowing Edgewood to make a large capital expenditure to install lights that could not be used for their intended purpose put the City at risk. (R.45, ¶¶99-101).

On March 21, 2019, Assistant City Attorney John Strange wrote to Edgewood and explained, "because the lights are part and parcel of a plan to conduct athletic contests at night, neither the lights nor the athletic contests are in compliance with the campus master plan." (R.45, ¶104). He also wrote, "[t]he stadium lights are capital improvements that were required to be shown in the Campus Master Plan by M.G.O. §28.097(5)(c)2 in order to be constructed without Plan Commission approval."

(R.45, ¶105). And, "Since the stadium lights are neither shown on nor mentioned in the campus master plan, the campus master plan must be amended per MGO Section 28.097(10)." (R.45, ¶105). "To that end," Strange wrote, "Edgewood's application was never in compliance with zoning at the time its lighting application was filed because the lights were not identified as improvements at the athletic field and therefore are simply not allowed absent additional Plan Commission approval." (R.45, ¶106).

## H.    Complaints about Edgewood violating its master plan.

In late March 2019, neighbors near Edgewood complained to the City that Edgewood was holding competitive games on its field in violation of its Master Plan. (R.45, ¶107). A City inspector issued Official Notices of Violation, instructing Edgewood to "[d]iscontinue holding athletic contests on the athletic field…." (R.45, ¶108). Official notices are warnings. (R.45, ¶110). The City did not issue a citation or fine Edgewood. (R.45, ¶111).

Edgewood appealed the notices to the City's Zoning Board of Appeals ("ZBA"). (R.45, ¶112). As the appeal progressed, Edgewood continued meeting with the neighborhood association and agreed not to move forward with its lights while productive conversations continued. (R.45, ¶¶113-114).

The ZBA heard Edgewood's appeal on July 11, 2019. (R.45, ¶116). Edgewood argued that if one of the high schools without a master plan wanted to build a correctional facility, they would be allowed to do that as a matter of right under the then-current zoning code because a correctional facility was an identified secondary use. (R.45, ¶117). Strange responded that under Edgewood's argument, Edgewood could turn the Oaks (a green space on Campus with heritage trees) into a cornfield

12

without Plan Commission approval because agriculture is an allowable use under the ordinance. (R.45, ¶118). The ZBA affirmed the Zoning Administrator's decision that Edgewood was required to amend its Master Plan to play athletic contests on its field. (R.45, ¶¶119-120).

On July 12, 2019, the City Attorney wrote to Edgewood that the City would take no further enforcement steps unless and until it provided Edgewood ample notice. (R.45, ¶¶122-124). Because Edgewood's entry of the Master Plan was voluntary, he invited Edgewood to file to terminate its Master Plan and return to the standard CI Zoning as the restriction on playing athletic contests was due to the language in Edgewood's Master Plan. (R.45, ¶¶125-126). Repeal of the Master Plan would permit Edgewood to play athletic contests on its field pursuant to M.G.O. §28.097. (*Id.*)

Edgewood subsequently asked the Mayor to sponsor an ordinance to repeal Edgewood's Master Plan. (R.45, ¶127). Edgewood understood that because its Master Plan was enacted as an ordinance, that another ordinance had to be enacted to repeal it. (R.45, ¶128).

## I.    Amendment to CI-District Ordinance to address flaw.

Meanwhile, Alder Tag Evers began having conversations with Strange following the ZBA hearing because "it became apparent that there was a flaw in the ordinance" as it "allow[ed] a landowner to proceed with a significant change of use [such as farming or building a correctional facility] that would be in contrast with the explicit Statement of Purpose as articulated in the Campus-Institutional District." (R.45, ¶¶129-132). Evers asked Strange to draft the amendment to address the flaw,

which he did. (R.45, ¶¶134-136). The amendment provided that in a Campus-Institutional District without a master plan: (1), the construction of a new building or additions to existing buildings that exceed 4,000 square feet; and (2) the establishment, improvement, or modification of any primary or secondary use occurring outside of an enclosed building required conditional use approval. (R.45, ¶137).

On August 26, 2019, the City's Plan Commission held a public hearing on the ordinance to repeal Edgewood's Master Plan and the proposed amendment to §28.097. (R.45, ¶¶138-139). The amendment to the CI-District ordinance was re-referred to September 16, 2019. (R.45, ¶140). To "re-refer" a matter means that matter would come back to the Plan Commission for further discussion. (*Id.*) The Plan Commission also re-referred Edgewood's Master Plan repeal matter to September 16. (R.45, ¶¶141-144).

If the Common Council approved both Edgewood's repeal of its Master Plan and the proposed amendment to §28.097 at the same time, the practical impact would be that Edgewood would be allowed to play games on its existing field but any improvement or modification to that field would require conditional use approval. (R.45, ¶¶145-146). The same was true if the Common Council approved the ordinance change before the repeal matter.

At a meeting on September 3, 2019, the Common Council re-referred the Edgewood repeal matter to the October 14 Plan Commission meeting but the amendment to the CI-District ordinance continued. (R.45, ¶¶147-149). On September

14

16, the Plan Commission recommended that the Common Council accept the change to the CI-District ordinance and on October 1, the Common Council adopted the amendment. (R.45, ¶¶151-155).

After Edgewood requested that vote on the repeal of its Master Plan be delayed, the matter came before the Plan Commission on December 9, 2019. (R.45, ¶¶158-159). The Commission recommended that the Common Council vote against allowing Edgewood to repeal its Master Plan because the Commission "did not feel that the repeal met the standard for map amendments based on public health, safety, and welfare." (R.45, ¶¶160-161). The Common Council disagreed and voted in favor of repealing Edgewood's Master Plan on January 7, 2020. (R.45, ¶163). Edgewood's Elliott was pleased with the vote. (R.45, ¶164).

On March 11, 2020, Edgewood filed a conditional use application for its stadium lights. (R.45, ¶¶165-166). The Plan Commission heard the application on May 11. (R.45, ¶168). City staff prepared a memo for the Plan Commission, stating that the "Commission ***can*** find the standards for conditional use approval met to approve the installation of lights for the Goodman Athletic Complex … ***subject to the recommended conditions*** of approval … ***and input at the public hearing***." (R.45, ¶169) (emphasis added). Staff did not find that the conditional use standards ***were*** met but only that the Plan Commission ***could*** determine they were met after consideration of the input from the public hearing. (R.45, ¶170).

The Plan Commission found the standards for conditional use were ***not*** met and placed the conditional use on file without prejudice. (R.45, ¶171). Specifically, the Commission determined:

> The Plan Commission could not find standard number 3 met finding that the lights would have a substantial negative impact on the uses, values, and enjoyment of surrounding properties and that no evidence was submitted by the applicant that there would not be negative impacts on the lighted use of the field and no mitigation measures proposed to limit those impacts, noise barriers, limits on events, et cetera.

(R.45, ¶172). The Commission indicated "they would be open to considering the request again if some redress of the noise impacts" was presented by the applicant, including improved engagement with the neighborhoods and a limit to the number of games with lights." (R.40-34 at 2).

Edgewood appealed the Plan Commission's decision to the Common Council, which heard the appeal on January 19, 2021. (R.45, ¶174, 175). The Common Council voted 13-4 to uphold the Plan Commission's decision. (R.45, ¶176). Based on evidence including two sound studies, adverse environmental impacts, and testimony about declining property values and negative impacts from neighbors, the City determined that Edgewood's proposal failed to meet the ordinance's requirement that the uses, values, and enjoyment of surrounding properties not be substantially impaired. (R.45, ¶¶177-179).

## SUMMARY OF ARGUMENT

The District Court properly granted summary judgment and correctly held that neither Memorial nor UW-Madison was a proper comparator under RLUIPA

because they were subject to different zoning criteria. As the District Court noted, there was overwhelming evidence that demonstrated that the City had legitimate reasons to deny Edgewood's permit.

The District Court also correctly held that Edgewood's inability to install lights on its field so it could play night games was not a substantial burden on its religious exercise. Edgewood is able to play its night games at a nearby site and has done so for years.

Edgewood erroneously asserts that that the District Court erred because it followed Seventh Circuit precedent in holding that it need not analyze Edgewood's Free Exercise claim separately because, while it is possible to violate RLUIPA without violating the First Amendment, the First Amendment cannot be violated in a zoning context without violating RLUIPA.

Finally, Edgewood has no claim to any vested rights as it is undisputed that Edgewood's Master Plan was in effect at the time of its lighting application and its application did not comply with it. As the Master Plan was an enacted ordinance, Edgewood's lighting application was not in full and strict compliance with the City's ordinances.

## ARGUMENT

## I.    Edgewood Was Not Treated Less Equally Than Other Institutions.

As Edgewood notes, a governmental entity can violate RLUIPA's equal terms provision in different ways, including by enacting a statute that facially differentiates between religious and nonreligious institutions, or, by applying a

facially neutral statute in a manner that is unfavorable to a religious land use and on less than equal terms to a comparable land user.[2] Edgewood admits that it does not assert a facial challenge, but only as-applied challenges against the City. (Br., 31).

To determine whether a religious institution has been given less than equal treatment when compared to a secular institution, the Court must look to see whether two institutions subject to the same land use regulations have been treated differently under the same accepted zoning criteria. *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 368–71 (7th Cir. 2010); *Eagle Cove Camp & Conf. Ctr., Inc. v. Town of Woodboro, Wis.*, 734 F.3d 673, 683 (7th Cir. 2013) (*abrogated on other grounds as recognized in Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015)); *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1003 (7th Cir. 2006). If a religious institution and its secular comparator "are treated the same from the standpoint of an accepted zoning criterion, that is enough to rebut an equal-terms claim." *Eagle Cove Camp*, 734 F.3d at 683 (quotation and ellipsis omitted).

It is necessary that the secular comparator received more favorable treatment under the *same* zoning regulation. *Vision Church*, 468 F.3d at 1003. It is also necessary that the two institutions be comparable according to the zoning

---

[2] Some courts also recognize that a government may violate RLUIPA by "gerrymandering" a facially neutral statute so that it regulates almost only religious land uses. Edgewood argued that below but has not raised that argument now and it is therefore, waived. *Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 319 n.2 (7th Cir. 2022) (arguments waived where opening brief failed to address claim).

regulation *at issue. See Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*, 905 F.3d 357, 368 (6th Cir. 2018) (naming the Seventh Circuit as among the majority of circuits "holding that a comparator for an equal terms claim must be similarly situated *with regard to the regulation at issue.*") (emphasis in original); *see also Immanuel Baptist Church v. City of Chicago*, 344 F. Supp. 3d 978, 984-85 (N.D. Ill. 2018) (rejecting argument that two institutions were not comparable because they fell within different zoning districts, because they were similar as to the parking ordinance criteria at issue).

Edgewood argues two separate equal terms violations: that the City wrongfully "prohibited Edgewood from continuing to use its field to host athletic contests and other uses," and the City withheld Edgewood's light permit after it had been "approved." (Br., 31).

### A.     The City did not violate RLUIPA's equal terms provision by interpreting the Master Plan to prohibit athletic contests.

Edgewood agues that it was error for the District Court to consider its first equal-terms claim, that the City "prohibited" Edgewood from using its field for athletic contests—only within the context of their second equal terms claim: that the City denied Edgewood's light permit after it was erroneously stamped "approved." Edgewood criticizes the District Court for describing that first claim as "tangential at best" and a "complete red herring at worst." But the District Court hit the nail on the head because Edgewood completely failed to show that it was harmed by the City's actions except by the denial of the lighting permit.

To begin, the City did not "prohibit" Edgewood from hosting athletic contests or using its field for other purposes. When the City learned that Edgewood was using its field to host athletic contests, the City merely informed Edgewood that such was in violation of the Master Plan. As Edgewood was already working on an amendment to the Master Plan at that time to add lights and a stadium, the City suggested that Edgewood include in the amendment that it would be hosting athletic contests. The City informed Edgewood that it would not take any enforcement action while the amendment was pending, as an approved amendment would moot any violation. (R.45, ¶¶88-90).

Edgewood originally took the City's advice and included athletic contests in its Master Plan amendment but ultimately decided to table the amendment. When neighbors later complained that Edgewood was hosting games in violation of its Master Plan, the City sent an inspector who issued two Notices of Violation. However, the Notices were *not* accompanied by a fine or any other enforcement action; they simply operated as a notice, or a warning. After Edgewood's appeal to the ZBA was denied, the City *again* informed Edgewood that it would not take any enforcement action unless and until the City gave Edgewood further notice, which it never did. (R.45, ¶¶122-124).

It is undisputed that from the date that the City first informed Edgewood that its athletic contests were in violation of its Master Plan to the present that Edgewood never stopped hosting athletic contests on its field. (R.46, at 28, Edgewood admitting it "never stopped scheduling games for its various teams on its

field, and never stopped using its field for other activities related to its primary mission."). Thus, the *only* adverse action that the City took as a result of its interpretation of the Master Plan was to deny Edgewood's lighting application. As this action forms the basis of Edgewood's second equal terms claim, it made sense for the District Court to analyze these two issues together.

Edgewood argues that the City's interpretation of its Master Plan is an equal terms violation independent of any other adverse action by the City because it (1) had to spend money on the appeal process, and (2) allegedly suffered reputational harm and lost donations. (Br., 33). However, this first alleged injury is not an injury at all, and Edgewood has introduced no competent evidence of the second alleged injury.

As to the first, there is no RLUIPA violation where "any delay, uncertainty, and expense amount to ordinary inconveniences inherent in the zoning process." *Christian Assembly Rios De Agua Viva v. City of Burbank, Illinois*, 237 F. Supp. 3d 781, 788 (N.D. Ill. 2017); *see also C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 761–62 (7th Cir. 2003) (The fact that appellants "expended considerable time and money ... does not entitle them to relief ... Otherwise, compliance with RLUIPA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations.").

And Edgewood never submitted any admissible evidence of reputational harm and lost donations. Edgewood's president submitted an affidavit that he "was

concerned" that Edgewood was suffering reputational harm based on his own reading of stories in the newspaper and that Edgewood lost donations, but such was conclusory opinion testimony without any foundation. Edgewood failed to supply *any* such evidence in discovery, and at best, such would be hearsay. (R.57, ¶144).

Even if it could be said that Edgewood suffered some sort of injury from the City's interpretation of its Master Plan apart from the denial of its lighting application, Edgewood's equal terms claim fails because Edgewood has not offered a similarly situated comparator that received better treatment under the zoning regulation at issue.

### B.    Memorial is not a similarly situated comparator.

Edgewood argues that Memorial, a public school with a lighted athletic field, is a similarly situated comparator that received better treatment. The thrust of Edgewood's argument is that Edgewood and Memorial are similarly situated simply because they are located within the same zoning district. Edgewood contends that under the CI-District ordinance, *all* institutions located in the district are permitted to engage in any of the land uses listed as permitted uses. (Br., 33).

However, this is simply not true. While M.G.O. §28.097(3) lists land uses that are generally permissible within the district, there are numerous reasons why any particular land user would not be allowed to engage in a use generally permitted within the district. For example, a land user might obtain a conditional use permit to allow it to engage in a land use that is not otherwise listed among the land uses

permitted in the district, subject to restrictions on land use that do not apply to other land users in the same district. *See, e.g,* 1 Am. Law. Zoning §9:20 (5th ed.).

Relevant here, M.G.O. §28.097 distinguishes between institutions with approved master plans and those that do not. M.G.O. §28.097(5) provided that a master plan must provide a description of both existing and proposed conditions for all land and open space uses. (Res.-App'x_0004). Additionally, it provided that no "changes to the proposed use of identified open space areas and other open space uses[] shall be permitted unless approved by" City officials as an amendment to the master plan. (Res.-App'x_0005-006).

Edgewood correctly notes that the primary benefit associated with securing an approved master plan is "streamlined approval of future building projects." (Br., 35). Though Edgewood now complains that the City did not treat Edgewood the same way that the City treated institutions that were zoned Campus-Institutional but that lacked master plans, Edgewood adopted its Master Plan because ***it did not want to receive the same treatment***.[3] The very purpose of a master plan is to be treated differently, and obtain approval for a decade's-worth of building projects upfront. By contrast, an institution without a master plan is required to obtain a conditional use permit before erecting ***any*** structure exceeding 4,000 square feet.

---

[3] In its brief, Edgewood argues that it "factually … rebutted the allegation" that it waived its right to use its field to host athletic contests. (Br., 37). But the City has never made a waiver argument. Even if Edgewood's decision to limit its description of field uses to team practices and classes were simply a mistake or a misunderstanding of §28.097, the ordinance still requires an institution to amend its master plan if it wishes to change the uses identified in that plan.

(R.45, ¶25). A conditional use permit was required for such institutions even if the use of the structure fell within the allowable uses under the ordinance.

Next, Edgewood incredulously argues that master plans are purely permissive, not restrictive, and do not limit land uses. (Br., 34-35). But Edgewood's argument conflicts with the ordinance's plain text, as well as the express purpose of the ordinance, which included "protect[ing] the livability and vitality of adjacent neighborhoods" and "enabl[ing] adjacent neighborhoods … to understand the levels of development being proposed, their likely impacts, and appropriate mitigation measures." (Res.-App'x_0001).[4] Without land uses or open-spaces being identified in a master plan, associated impacts and mitigation measures could not be addressed.

Further, master plans must include a both "description of existing conditions" and "proposed conditions," including its future needs/capital improvements, land uses, landscape treatment, and open-space areas, because certain projects identified in a master plan might be treated differently if City officials are made aware of existing land uses that change the context of those projects or uses. (Res.-App'x_0004). For example, a concrete ramp might appear to be a perfectly reasonable project if it its stated use is for parking vehicles but would likely face opposition if it was to be used to host skateboarding competitions.

---

[4] Further, Edgewood's interpretation of the ordinance would produce the absurd results that institutions without a master plan are the only institutions required to obtain conditional use approval for their building projects but that those with master plans could build any building it wished without amending its master plan or obtaining any zoning approval at all, so long as the building fell within the permitted uses under the ordinance. Thus, an institution could obtain master plan approval to build a school and then turn around and build a hospital in an area wholly unsuited to that type of use or, a developer wishing to build a hospital could simply purchase a site from a school with an approved master plan.

Edgewood argues that the Master Plan is completely irrelevant to determining whether another institution is a similarly situated comparator, claiming that, "[a]s a matter of law, this Court's 'accepted zoning criterion' test is conducted at the district level and focuses on the general character of the particular zoning district at issue." (Br., 34). According to Edgewood, the Court need only answer one "simple, objective question" to determine whether a religious institution received less favorable treatment than a secular comparator: "is the government prohibiting a religious institution from using property in a manner that is comparable to how a nonreligious institution is permitted to use property within the [same] district?" (Br., 35).

Edgewood cites *River of Life*, 611 F.3d at 373–74, for this proposition but *River of Life* says nothing of the sort. It is true that in *River of Life*, this Court examined whether two land users were comparable with respect to the criteria defining the character of a commercial zoning district. But that is because the plaintiff was a church that had been totally excluded from the commercial district on the grounds that churches were not suitable to the character of that district. This Court stressed that it was addressing only a "straightforward" question relating to whether a church was compatible with a commercial zone, and cautioned there would likely be "cases in the future challenging zoning ordinances that are harder to classify, as variances and special-use permits and grandfathered nonconforming uses blur the character of particular zoning districts." *Id.* at 374.

25

*River of Life* did not hold, and this Court has never held, that the applicable zoning criteria for an equal terms comparison is always the criterion defining the character of a zoning district. It just so happened that plaintiff in that case was denied a permit due to its nonconformity with those criteria. But that is not what happened here. Edgewood's own summary judgment opposition brief explains why it is illogical to use zoning districts as the litmus test for whether Memorial and UW-Madison are similarly situated comparators. Edgewood wrote:

> Typically, an equal-terms case involves a religious institution or assembly that wants to come into a zoning district in which a comparable nonreligious institution or assembly is already allowed to operate ... But this case is distinguishable from those cases ... because, here, Madison was not keeping EHS from locating in a Campus Institutional District. EHS was already zoned Campus Institutional in 2013 along with the MMSD schools and parts of the UW Campus.

(R.46 at 37). If Edgewood wanted to be zoned Campus-Institutional, but the City refused, one might examine whether Edgewood and Memorial are similar with respect to the "general character of the particular zoning district at issue." But as Edgewood admitted, that is not the case here.[5]

The test in the Seventh Circuit is whether two land users are similar with respect to the accepted zoning criteria applicable *to the land use regulation at issue*. *See, e.g.*, *Tree of Life Christian Sch.*, 905 F.3d at 368 (naming the Seventh Circuit as among the majority of circuits "holding that a comparator for an equal terms claim

---

[5] If zoning districts were determinative and a master plan were irrelevant, then any religious land user in the district who lacked a master plan would be able to effectively argue that it was entitled to build any building it wanted and could bypass both the master plan and the conditional use processes.

must be similarly situated *with regard to the regulation at issue.*") (emphasis in original); *Christian Assembly*, 237 F. Supp. 3d at 792 ( "[t]he Court considers how *the land use regulations at issue* affect similarly situated institutions with respect to accepted zoning criteria" (emphasis added)).

Contrary to Edgewood's assertion that two land users are always similarly situated if they share the same zoning district, in *Vision Church*, 468 F.3d at 1003, this Court held that a church and a school that were located across the street and *within the same zoning district*, and both applied for the same permit were *not* similarly situated comparators. Both institutions were zoned residential, and both needed a special use permit to build. The school's special use permit was granted. When the church applied for the same permit three years later, the standard for approval had changed and the church did not meet the new requirements. This Court held that because a different version of the zoning regulation was applied to the church than to the school, they were not similarly situated comparators.

*River of Life approvingly* cited *Vision Church* for the rule that if two institutions are evaluated under different standards because they apply for zoning relief in different years, that "***compels*** the conclusion that there was no unequal treatment" and they cannot be proper comparators. *River of Life*, 611 F.3d at 370 (quoting *Vision Church*, 468 F.3d at 1002–03) (emphasis added).

The same applies here. Memorial did not have a master plan and thus its land uses were only limited to the permitted uses within the zone. However, while Edgewood's Master Plan was in effect, it was subject to different standards than

Memorial. After Edgewood repealed its Master Plan, it was free to use its field for any of the uses permitted within the zone—same as Memorial.

### C.    UW-Madison is not a similarly situated comparator.

Edgewood argues that even if the Master Plan was relevant to determining whether a similarly situated comparator received better treatment, that it can still prevail on its equal terms claim, pointing to the City's treatment of UW-Madison.

Edgewood claims that "spaces in UW's master plan listed as 'Rec Sports' facilities were used for high school competitions, that facilities identified for 'Athletics' were used for instructional camps, clinics and private lessons, and that fields limited to 'flag football' were used for baseball, softball, lacrosse, rugby, 'and more.'" (Br., 39). However, Edgewood does not actually identify any inconsistencies with the land uses identified in UW's Master Plan and the uses it says occurred at those facilities. The phrase "Rec Sports" in no way excludes high school competitions and "Athletics" in no way excludes tennis camps, tennis clinics, or private tennis lessons. Further, the statement in UW's master plan that the Near West Field's would be upgraded "to create five synthetic turf flag football fields" does not describe the use of the fields, only the dimensions.

More importantly, UW's Master Plan contained more expansive language[6] and did not contain any language limiting the use of its fields to team practices and physical education classes—a description that can naturally be read to exclude

---

[6] UW's Master Plan repeatedly indicated their facilities' use for competitions and UW does not obtain electrical permits from the City because it is an entity of the state. (R.45, ¶¶207, 211-216).

athletic contests, particularly given the context in which Edgewood's Master Plan was adopted: carefully negotiated with two neighborhood associations that Edgewood knew were "vehemently" opposed to athletic contests taking place on the field and which Edgewood repeatedly stated would be used only for practices and classes.[7] Such was a reasonable construction for the City to take. *See, e.g., Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1232 (11th Cir. 2006) ("[W]e consider the City's 'own authoritative construction of the ordinance, including its implementation and interpretation' and defer to that construction 'so long as its interpretation is based on a permissible construction.'").

Regardless, however, this argument is another red herring. Edgewood admitted below that it never stopped using its field for athletic contests, (R.46 at 28), and more importantly, Edgewood must show a similar comparator as it relates to the matter *at issue*, which is denial of its lighting permit.

### D. Edgewood lacks a similarly situated comparator for denial of its lighting permit.

Edgewood erroneously contends that there is a factual dispute regarding what City ordinances were applicable to its lighting permit. According to Edgewood, because a City employee initially told Edgewood that City "***believes*** this permit can be issued without requiring amendment of the approved 2014 Master Plan" (R.45,

---

[7] Edgewood's decision to specifically list team practices and physical education as the only identified uses of the field can only be read to exclude athletic contests. *Expressio unius est exclusio alterius* (the expression of one thing excludes another) is a "well-established canon" in Wisconsin. *State v. Delaney*, 2003 WI 9, ¶22, 259 Wis. 2d 77, 658 N.W.2d 416. The canon applies "when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).

¶92, emphasis added), a reasonable jury could conclude that the lights did not in fact need to comply with the Master Plan, and only needed to meet the technical requirement of M.G.O. §10.085. (Br., 41-42). But it is not up to the jury to decide what ordinances applied to Edgewood's permit because, as with "statutory interpretation, the interpretation and application of a municipal ordinance is a question of law ...." *Grycowski v. Milwaukee Employees' Ret. Sys./Annuity & Pension Bd.*, 2021 WI App 7, ¶32, 395 Wis. 2d 722, 953 N.W.2d 904.

Despite Edgewood's assertions, the City did not and could not change the criteria applicable to its permitting decision. The answer to a question of law cannot be altered by a City employee's initial erroneous interpretation of the ordinance. *Cf. Willow Creek Ranch, L.L.C. v. Town of Shelby*, 2000 WI 56, ¶49, 235 Wis. 2d 409, 611 N.W.2d 693 ("it is well established that erroneous acts or representations of municipal officers do not afford a basis to estop a municipality from enforcing zoning ordinances enacted pursuant to the police power"). "Binding municipalities to every representation made by subordinate employees would produce severe results for the municipalities," cause "[e]ndless litigation," and delay "important municipal decisions." *Id.* at ¶50.

After Tucker stated his belief, his supervisor, George Hank, corrected the error, deciding that the lighting permit should not issue based on M.G.O. §10.085(1) and (5)(b). (R.45, ¶¶96-97). Specifically, M.G.O. §10.085(1) required outdoor lighting to be in conformance not only §10.085 but all other codes and regulations. (R.45, ¶98). Hank believed that the language of Edgewood's Master Plan was inconsistent

with its lighting application and that allowing Edgewood to make a large capital expenditure to install lights that could not be used for their intended purpose put the City at risk. (R.45, ¶¶99-101). The City denied Edgewood's application because Edgewood stated that it would use the lights to host nighttime athletic contests in contravention of its Master Plan, and the lights constituted capital improvements and M.G.O. §28.097 required that capital improvements be described in the Master Plan.

Edgewood argues that the numerous (and supposedly inconsistent) reasons the City cited to deny its permit creates a question of fact "as to the real basis" for the City's withholding the permit and "raise[s] for a jury a permissible inference of pretext and bad faith, and thus a finding of unequal treatment."[8] (Br., 43). However, this supposed fact issue is immaterial because the Seventh Circuit's equal terms test is an objective inquiry looking only at whether two institutions are similar as to the same accepted zoning criteria; the City's purposes and motives are irrelevant to this objective inquiry. *See River of Life*, 611 F.3d at 371 ("'Purpose' is subjective and manipulable, so asking about 'regulatory purpose' might result in giving local officials a free hand in answering the question 'equal with respect to what?' 'Regulatory criteria' are objective—and it is federal judges who will apply the criteria to resolve the issue.").

---

[8] If anything, the City citation of numerous reasons to deny Edgewood's permit suggests its decision was well-supported.

31

Edgewood again points to Memorial as a similarly situated comparator for its claim that Edgewood received less than equal treatment when the City denied its lighting application. But the comparison fails for the same reason as before: Edgewood's lighting permit was denied due to non-conformance with its Master Plan and because Memorial did not have a master plan, the two institutions were not subject to the same standards at the time each submitted its application. Therefore, Edgewood has not identified a similarly situated comparator and its equal terms claim fails.

## II.    Edgewood Has Not Met Its Burden To Show That Its Free Exercise Of Religion Has Been Substantially Burdened.

### A.    Edgewood cannot show more than a mere inconvenience.

The Seventh Circuit has held, that "[a]ny land-use regulation that a [religious institution] would like not to have to comply with imposes a 'burden' on it, and so the adjective 'substantial' must be taken seriously lest RLUIPA be interpreted to grant [religious entities] a blanket immunity from land-use regulation." *World Outreach Conf. Ctr. v. City of Chicago*, 591 F.3d 531, 539 (7th Cir. 2009) (city's denial of demolition permit was only a "modest" burden because there was "a suitable alternative site" for church's desired use). "[S]ubstantiality is a relative term—whether a given burden is substantial depends on its magnitude in relation to the needs and resources of the religious organization in question." *Id.*; *see also Affordable Recovery Hous. v. City of Blue Island*, No. 12-CV-4241, 2016 WL 5171765, at *10 (N.D. Ill. Sept. 21, 2016), *aff'd*, 860 F.3d 580 (7th Cir. 2017)

32

("Generally speaking, RLUIPA does not provide religious institutions with immunity from land use regulations, nor does it relieve religious institutions from applying for variations, special permits, or exceptions to land use regulations."); *Young v. McKee*, No. 2:17-CV-23, 2019 WL 5273963, at *4 (W.D. Mich. July 16, 2019), ("RLUIPA was not intended to create a cause of action in response to every decision which serves to inhibit or constrain religious exercise, as such would render meaningless the word 'substantial.'").

Courts recognize that "a substantial burden is more than an inconvenience and is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Dorman v. Aronofsky*, No. 20-10770, 2022 WL 2092855, at *4 (11th Cir. June 10, 2022) (quotation omitted); *see also Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007) ("A substantial burden must place more than an inconvenience on religious exercise."); *Shaw v. Cnty. of Milwaukee*, No. 22-C-97, 2022 WL 1063726, at *3 (E.D. Wis. Apr. 8, 2022) ("A 'substantial burden' puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."). As this Court recognized, the relevant inquiry is whether the land use rule at issue "seriously violates" the plaintiff's religious beliefs or exercise. *Schlemm*, 784 F.3d at 364. "Seriously" means something more than "modestly" but less than "overwhelmingly." *Id.* at 365.

Edgewood has not argued that football itself is a religious practice or that there is a Catholic tenet that dictates it host athletic competitions on its field at night. Instead, Edgewood identifies its religious exercise and correctly formulates

33

the issue as: "The real question is whether Edgewood's full and equal use of its property is *integral* to its religious mission to attract and retain students to educate in the faith, and to build bridges with the community to further its religious values." (Br., 49 (emphasis added)). But Edgewood has failed to produce evidence to suggest even a modest burden.

To show that the inability to host athletic contests on its field at night "seriously" violates Edgewood's religious beliefs would first require a finding not only that athletics in general are central to its ability to attract students and engage the community, and not only that those particular sports which take place on that type field are themselves critical to that mission, and not only that the ability to host those games on its own field is critical to that mission, but that hosting athletic contests for *those particular sports, on its own campus, at night* is critical to its ability to attract students and engage the community.

As the District Court correctly noted, at no point in Edgewood's 100-year history has Edgewood ever had the ability to host athletic events on its field at night. That alone completely undercuts Edgewood's argument that the ability to do so is "integral" to its ability to attract students and build partnerships.

A reasonable jury could not conclude otherwise. Edgewood has not introduced any surveys or expert testimony that suggest that parents pay attention to athletics in particular when choosing to pay Edgewood's tuition, as opposed to the academic environment or the religious curriculum (much less that parents look at *where* the

athletic program hosts *night games* as opposed to the overall strength or its program or the diversity of its offerings).

In fact, Edgewood has not even introduced any competent evidence that field use boosts enrollment. The only relevant evidence on that point is that Edgewood's enrollment declined after Edgewood renovated its field in 2015 and began using the field more intensively to host athletic contests. (R.45, ¶¶226-227). Further, Edgewood's accreditor suggested that Edgewood's enrollment struggles are most closely linked to the academic strength of Madison's public schools. (R.33, 50:17-51:1).

In a factually similar case, the Eighth Circuit found that a Catholic school "ha[d] not demonstrated that its religious exercise is substantially burdened, rather than merely inconvenienced, by its inability to use its baseball field at night." *Marianist Province of United States v. City of Kirkwood*, 944 F.3d 996, 1001 (8th Cir. 2019). The court announced that it "agree[d] with other circuits that have concluded requiring a religious institution to use feasible alternative locations for religious exercise does not constitute a substantial burden." *Id*. (citing *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1035 (9th Cir. 2004) (finding that a Christian college was not substantially burden by being denied the ability to offer religious education at its preferred site when it was not "precluded from using other sites within the city"); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227-28 (11th Cir. 2004) (requiring a synagogue to relocate was not a substantial burden even though it required elderly congregants to "walk[ ] a few

extra blocks"); *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1007-09 (6th Cir. 2017) (Christian school not substantially burdened by denial of permit to relocate to a more convenient location because school could still carry out its religious mission at its current location).

In another similar case, a church (which also ran a school) argued that a city ordinance prohibited buildings over 25,000 square feet substantially burdened its free exercise of religion, as it prevented the church from expanding its facilities to build a 34,989 square foot gymnasium on-site. *Living Water Church*, 258 F. App'x at 737. The church argued that it was unable to practice its religious beliefs because the facilities were too small, and the lack of adequate space was forcing Plaintiff to choose between its daycare and Christian Education ministries. *Id.*

The Sixth Circuit determined that the church was not substantially burdened by the ordinance because:

> The Township's denial does not preclude the church from moving its school to the church property; it does not require the church to forgo providing religious education; it does not preclude the church from enrolling students in its school; it does not prevent church members from entering the property and conducting worship or prayer services; it does not preclude the church from running religious programs and meetings in the evenings and on weekends; it does not preclude the church from accepting new members into its congregation.

*Id.* at 738. While the court "underst[ood] the church's reason for wanting a gymnasium" and "concede[d] that it would be more convenient to have that facility onsite," the court was "hard-pressed to conclude that Living Water will be unable to

carry out its church missions and ministries without it" and concluded that "mere inconvenience" does not "equate[] to a substantial burden." *Id.* at 739.

Importantly, the Court in *Marianist Province* noted that the Catholic school was "not being forced to violate its religious beliefs." 944 F.3d at 1001. "Rather, [the city's] regulations require only that [the school] engage in these forms of exercise— community outreach, athletic activities, student prayer, etc.—either during the day or at alternative locations."[9] *Id.*

Similarly, Edgewood has not identified a Catholic tenet that requires it host sports games at its campus at night, *see Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004) (finding no substantial burden where synagogues congregants did "not claim that their current location has some religious significance such that their faith requires a synagogue at this particular site"), and Elliott admits that "'for the most part' Edgewood has been able to host its night athletic games at other fields. (R.45, ¶219; ¶¶192-193). Elliott also admits that Edgewood has had at least some amount of partnerships with nonprofits regarding daytime use of its field despite not having lights on its field. (R.45, ¶220).

It is not a substantial burden on Edgewood's free exercise of religion for Edgewood to limit itself to day games, or to host a portion of its home night games at alternative locations.

---

[9] Notably, Edgewood has never used another field for any nighttime use other than sports. (R.45, ¶194).

Edgewood also has not been substantially burdened by the City's actions because Edgewood never had a reasonable expectation that it would be able to host night games on its field. *See Andon, LLC v. City of Newport News, Va.*, 813 F.3d 510, 515 (4th Cir. 2016) ("The plaintiffs here never had a reasonable expectation that the property could be used as a church," and therefore the City's denial "did not alter any pre-existing expectation that the plaintiffs would be able to use the property for a church"); *Christian Assembly*, 237 F. Supp. 3d at 789 (no substantial burden where "the Church had no reasonable expectation of using the property for religious purposes and assumed the risk of the SUP's denial and any zoning changes preventing use of the property as a church"). Additionally, "[a] self-imposed hardship generally will not support a substantial burden claim under RLUIPA, because the hardship was not imposed by governmental action altering a legitimate, pre-existing expectation that a property could be obtained for a particular land use." *Andon*, 813 F.3d at 515.

Here, Edgewood's Master Plan is a self-imposed hardship and Edgewood never had a pre-existing expectation that its field could be used for night games. Edgewood worked with the neighborhood associations in drafting a Master Plan that carefully dictated the height, location, and visibility of lights, and that stated that Edgewood's field would be "[u]sed for team practices, physical education classes." (R.45, ¶¶35-42).

**B.    The permit denial was not absolute.**

Edgewood claims that it was substantially burdened because the City's denial of its lighting permit was absolute (Br., 60), and that the City could have granted its lighting application "subject to conditions." Not so. First, stadium lights were not identified in the Master Plan as capital improvements, so allowing the lights would have violated the CI-District ordinance and the Master Plan, which was an enacted ordinance. (R.45, ¶¶15, 127). Second, the City did not absolutely deny Edgewood's lights but instead told Edgewood it would have to first amend its Master Plan.

While Edgewood ultimately elected to repeal its Master Plan instead of amending it, by the time of its repeal, the ordinance had been amended to require *all* campus institutions without a master plan to seek a conditional use permit for the establishment or modification of an outdoor use. Even after the ordinance was amended, Edgewood chose to continue with its plan to repeal its Master Plan, rather than pursue a master plan amendment.

Subsequently, Edgewood submitted a conditional use permit application to the Plan Commission. However, the Commission found that the established uses, values, and enjoyment of surrounding properties would be harmed if the permit were granted because Edgewood did not agree to mitigation measures such as limiting the number of games.[10]

---

[10] Edgewood argues that it did agree to limit the number of games, but Edgewood only agreed to a limit of the total number of possible games in a year, including any potential championship or playoff games. The Plan Commission felt that this was not a limit at all. (R.45, ¶176).

But even then, the Plan Commission did not absolutely deny Edgewood's conditional use application, but instead, placed it "on file without prejudice," meaning that Edgewood could apply again if it addressed the deficiencies in its application. In fact, the Commission indicated that "they would be open to considering the request again" if Edgewood addressed the noise impacts, improved engagement with the neighborhoods, and agreed to a limit to the number of games with lights. (R.45, ¶173). That is fatal to Edgewood. "[W]hen the denial of a religious institution's application to build is not absolute, such would not necessarily place substantial pressure on the institution to alter its behavior, since it could just as easily file a second application that remedies the problems in the first" and thus, "does not constitute a substantial burden on the free exercise of religion." *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007).

Accordingly, Edgewood was never absolutely denied a lighting permit and Edgewood cannot show a substantial burden on that basis.

### C.     Edgewood must, but cannot, show any arbitrary or bad faith action of the City for its undue expense argument.

Edgewood erroneously argues that it does not have to prove bad faith to establish its claim that the City's denial of Edgewood's lighting application caused it to suffer a substantial burden of unreasonable delay and expense, noting that under the text of RLUIPA and the statute's legislative history, a religious institution can show a substantial burden without proving animus. (Br., 58, citing *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 899 (7th

40

Cir. 2005)). But while bad faith is not a necessary element of a substantial burden claim, mere delay, uncertainty, and expense is not a substantial burden without bad faith. *Christian Assembly*, 237 F. Supp. 3d at 788-89. Otherwise, nearly any plaintiff who has gone through the zoning process could demonstrate it suffered a substantial burden.

Edgewood's reliance on *Sts. Constantine* is misplaced. In *Sts. Constantine*, a Church asked the City of New Berlin to rezone a 14-acre parcel on its property from residential to institutional so that it could build a church. 396 F.3d at 898. The city was concerned that if the parcel was rezoned for institutional use, a school or other nonreligious facility could one day be built on the parcel, were the Church to cancel its construction plans. *Id.* "To allay this concern the Church modified its application by coupling" it with "a proposal that New Berlin promulgate a 'planned unit development [PUD] overlay ordinance' that would limit the parcel to church-related uses." *Id.*

The New Berlin Planning Commission voted the proposal down, stating that "if the Church didn't build a church on the property but instead sold the land, the purchaser would not be bound by the PUD." *Id.* But this was untrue. *Id.* ("Nothing in the text of the PUD proposed by the Church, in the provisions of the New Berlin Municipal Code, or in the general property law of Wisconsin or elsewhere, suggests that the ordinance would lapse with the sale of the property."). The Planning Commission's rejection of the proposal based on what was a patently frivolous basis was arbitrary and raised the inference of bad faith. *Id.* at 901.

41

The city suggested that the Church either apply for a conditional use permit, or submit a new PUD request, neither of which would solve any problem that was not already solved by the Church's proposal and that the city already rejected based on its false statement. The city was requiring the Church to start the application process all over again for no reason at all, especially given the Plan Commission's reliance on an untrue statement to deny the initial proposal.

Thus, *Sts. Constantine* involves a city arbitrarily denying a religious institution from using a particular site without any justification, and the court there said in that instance, the church demonstrated that the city acted in bad faith and had shown a substantial burden in the delay and undue expense of the city requiring another application. The court did not  suggest that a religious institution establishes a substantial burden and bad faith simply because the institution is given an opportunity to address a concern and re-apply for a permit.

Here, Edgewood cannot show bad faith by the City. The Seventh Circuit recognizes that the expenditure of time and money is an inherent part of the zoning process and is not enough, by itself, to state a substantial burden claim. *Eagle Cove Camp & Conf. Ctr.,* 734 F.3d at 681 ("fact that [plaintiff] has spent considerable time and money on various applications for rezoning does not constitute, *prima facie*, a substantial burden.") (*abrogated on other grounds as recognized in Schlemm*, 784 F.3d at 364); *see also C.L. for Urb. Believers*, 342 F.3d at 761–62 (no relief under RLUIPA's substantial burden provision even though plaintiff expended considerable time and money).

42

Edgewood argues that even if bad faith is needed to state a claim based on uncertainty, expense, and delay, Edgewood has met its burden, asserting the City changed its interpretation of Edgewood's Master Plan and the criteria for lighting permits. But the City's interpretation that the Master Plan precluded athletic contests was consistent throughout. And, the City did not change the criteria for Edgewood's lighting application as Edgewood's Master Plan was always in effect.

Edgewood contends that a reasonable jury could conclude that its permit was denied not because of neutral zoning regulations but because "public outcry." (Br., 59, n.11). Setting aside that such is not supported by the factual record, the District Court correctly noted that Edgewood misread the cases on which it relied to argue unequal treatment under RLUIPA based on public outcry and even if such evidence existed, it still failed to provide any evidence of a substantial burden on Edgewood's religious exercise.[11] (SApp.021-22).

### D.    The District Court's decision did not turn on animus.

Edgewood argues that the District Court erroneously considered that it could not show proof of animus, which warrants reversal. (Br., 59). Edgewood ignores, however, the District Court's reasoning. While the court made a stray comment

---

[11] Plaintiff seizes on a single email, written by employee Alan Harper, who cautioned that he was "not really in the loop on this one," who was not the employee assigned to review Edgewood's lighting application, and who had never even reviewed a lighting application before. The inaccurate statement in Harper's email was quickly corrected by his department head, George Hank, who was involved. Harper testified unequivocally that Hank had never told him that Edgewood's permit was being withheld due to public outcry, but rather, that he simply assumed that public outcry related to the project, which he had seen in the news, had some connection to the withholding of the permit. (*See* R.65-10; R.91 at 6:17-23, 19:6-23, 20:14-21:7, 21:22-22:2).

about animus (SApp.17), that comment was not essential to or even part of its reasoning as to Edgewood's failure to establish an equal comparator or its inability to show a substantial burden on its religious exercise. Indeed, after a thorough explanation of why Memorial and UW-Madison were not equal comparators, the court noted that there was overwhelming evidence of the City's reasons for denial of the permit and that Edgewood offered no evidence of pretext. (SApp.016-17). The court then rejected Edgewood's assertion that a stray comment by a city alder about "private institutions" was sufficient to show pretext. The court's reference to animus in discussing Edgewood's summary judgment brief is understandable as Edgewood referred to a city alder's motives. (R.46 at 21).

## III.    Like Its RLUIPA Claim, Edgewood's Free Exercise Claim Fails.

Edgewood argues that the District Court erred in "bypass[ing]" Edgewood's Free Exercise claim because Edgewood could not prove an RLUIPA claim. (Br., 63). The District Court's analysis, which relied on two Seventh Circuit cases, was correct. The court did not need to analyze these claims separately because, while it is possible to violate RLUIPA without violating the First Amendment, the First Amendment cannot be violated in a zoning context without violating RLUIPA and the remedies afforded by RLUIPA and the First Amendment are the same. *See Schlemm*, 784 F.3d at 363 (bypassing First Amendment arguments because RLUIPA "provides greater protection"); *Vision Church*, 468 F.3d at 996 ("Given the similarities between

RLUIPA §2(a)(1) and First Amendment jurisprudence, we collapse Vision's claims for the purpose of this analysis" as such approach is consistent with post-RLUIPA cases).

Edgewood argues that *Schlemm* and *Vision Church* are no longer good law, claiming a 'seismic shift' in Free Exercise jurisprudence, citing *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) and *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868 (2021). Edgewood asserts that the Supreme Court clarified whether a restriction on the free exercise of religion is of general applicability or whether two activities are comparable under the Free Exercise Clause. (Br., 64). Neither *Newsom* nor *Fulton* overrule *Schlemm* or *Vision Church* and neither help Edgewood.

Edgewood argues that under *Tandon*, 141 S. Ct. at 1296, government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat "*any* comparable secular activity more favorably than religious exercise." (Br., 64). But this language in *Tandon* referred to *facial* challenges to statutes where the text of the statute itself treated religious activities less favorably than comparable secular activities. The court found that California's COVID restrictions "treat[ed] some comparable secular activities more favorably than at-home religious exercise, permitting hair salons, retail stores, personal care services, … theaters, … and … restaurants to bring together more than three households at a time" while households were not permitted to gather for religious activities. 141 S. Ct. at 1297. Such facially disparate treatment demands strict scrutiny. *Id.* at 1296.

By contrast, "RLUIPA's Equal Terms provision operates on a strict liability standard; strict scrutiny does not come into play." *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 269 (3d Cir. 2007). As RLUIPA provides for strict liability (and not strict scrutiny), whether a plaintiff succeeds in making a facial challenge or an as applied challenge, RLUIPA's protections are significantly stronger.

Edgewood brought an *as applied* RLUIPA challenge against the City. At no point has Edgewood argued that the City's ordinances are not facially neutral and even conceded that the City's conditional use process is facially neutral. (R.45, ¶230). If a city applied a facially neutral statute more favorably to a secular land user than to a religious one, such could conceivably give rise to a free exercise claim. *World Outreach*, 591 F.3d at 535. But given that RLUIPA provides strict liability, as this Court noted, one "cannot see any point in a plaintiff's pitching a religious discrimination claim on any provision of the Constitution, rather than just on the statute." *Id.* Thus, Edgewood's free exercise claim fails for the same reasons its RLUIPA's equal terms claim fails.

Edgewood's reliance on *Fulton* fares no better. Edgewood cites a general statement in *Fulton* that "[a] law … lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interest in the same way." (Br., 64). But *Fulton* was addressing individualized exemptions—specifically a religious organization's foster care contract. The religious organization refused to certify same-sex couples as foster parents. The municipality refused to contract with the religious organization, relying on the non-discrimination

provision in its contract. However, the non-discrimination provision permitted exceptions to this requirement at the 'sole discretion' of the Commissioner. The Court held that this inclusion of a mechanism for entirely discretionary exceptions rendered the non-discrimination provision not generally applicable. *Fulton*, 141 S. Ct. at 1878; *see also id.* (having created an individualized exemption the city "may not refuse to extend that system to cases of 'religious hardship' without compelling reason.").

But there are no parallels here. The CI-District ordinance did not contain any system of individualized exemptions; rather institutions with master plans were subject to certain provisions of the ordinance and those without master plans were subject to others. Moreover, even if there were a system of exemptions in place, Edgewood offers no religious hardship that it argues justifies an exemption. *Fulton* is inapplicable. Additionally, the doctrine only applies if the failure to apply the exemption burdened Edgewood's religious exercise, which as explained above, Edgewood cannot show.

Edgewood's remaining arguments are meritless. Edgewood argues that the City denied Edgewood use of its field as compared to other public high schools and UW even though these schools "were CI District." (Br., 64). But there are at least three problems with this argument.

First, the City did not deny Edgewood use of its field as Edgewood admitted below that it never stopped using its field. (R.46, at 28). Second, the public high schools did not have master plans and thus, there is no comparable treatment. Third, while UW did have a master plan and therefore, was subject to the same ordinance

provisions as Edgewood, UW's master plan did not limit its field use to practices and physical education classes.

Finally, Edgewood cites a Third Circuit case, *Lighthouse Inst. for Evangelism*, 510 F.3d at 273, contending that simply because a government action does not violate RLUIPA, does not mean that it does not violate a constitutional right. (Br., 65). However, Edgewood cannot contend that the District Court should have followed a Third Circuit decision instead of *Schlemm* and *Vision Church*—two Seventh Circuit cases. *U.S. v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994) (district court in Wisconsin must follow Seventh Circuit decisions, not other circuits).

More importantly, to the extent *Lighthouse* has any applicability, it supports the City. *Lighthouse* recognized, "unlike RLUIPA, which explicitly defines as religious exercise: 'The use, building, or conversion of real property for the purpose of religious exercise,' the Free Exercise Clause does not define land use as a religious exercise." 510 F.3d at 273. The Third Circuit and "several sister circuits have held that, when the plaintiff does not show that locating its premises in a particular location is important in some way to its religion and the area from which plaintiff's building is excluded is not large, there is no constitutionally cognizable burden on free exercise." *Id.* at 274. Courts in the Seventh Circuit are in accord. *See, e.g.*, *Irshad Learning Ctr. v. Cnty. of DuPage*, 804 F. Supp. 2d 697, 717 (N.D. Ill. 2011) (religious plaintiff making a Free Exercise challenge "must explain in what way the inability to locate in the specific area affects its religious exercise").

48

The only place Edgewood was restricted from erecting stadium lights was its on-campus field. Indeed, Edgewood College built a stadium with stadium lighting in Fitchburg. (R.45, ¶183). Edgewood does not argue that its on-campus field bears some religious significance, only that it is more convenient for its mission to educate the whole student and build community. *See Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 654 (10th Cir. 2006) (No free exercise burden where there is "no evidence that a [daycare center] or building a [daycare center] on the particular site is intimately related to the [church's] religious tenets").

## IV.    Edgewood Does Not Have A Vested Right To Install Stadium Lights.

Edgewood erroneously asserts that its lighting application gave it a vested right to erect stadium lights. (Br., 66-69). To begin, vested rights are created only when a landowner submits a permit application that is conformant with a municipality's regulations. *See Golden Sands Dairy LLC v. Town of Saratoga*, 2018 WI 61, ¶22, 381 Wis. 2d 704, 913 N.W.2d 118. "[S]trict and complete conformance with applicable zoning and building code requirements" is required for rights to vest. *Lake Bluff Hous. Partners v. City of S. Milwaukee*, 197 Wis. 2d 157, 174, 540 N.W.2d 189 (1995). "The rule is an exception to the general policy that property owners obtain no vested rights in a particular type of zoning solely through reliance on the zoning as it exists at the time." *Meinholz, LLC v. Dane Town Bd. of Zoning Appeals & Adjustment*, 2022 WI App 30, ¶64, 978 N.W.2d 88 (citing *Golden Sands*, 381 Wis. 2d 704, ¶21 (alteration and quoted source omitted)). Vested rights require

49

strict and complete compliance with zoning and building code requirements, "because a builder's proceeding in violation of applicable requirements is not reasonable." *Lake Bluff*, 197 Wis. 2d at 175.

Edgewood does not have a vested right to stadium lights because its permit application did not comply with the zoning regulations in effect at the time of filing. It is undisputed that Edgewood's application was filed while its Master Plan was in effect. A CI-District master plan is a zoning ordinance and as such, Edgewood needed to fully comply with that duly enacted Master Plan before it could claim any vested rights. (R.58, ¶15).

Edgewood's lighting application was not compliant with its Master Plan. Edgewood indicated that the lights would be used to host athletic contests and Edgewood's Master Plan limited the field use to practices and classes. (R.58, ¶¶93, 83). The Master Plan also prohibited the *installation* of lights on the field. The CI-District ordinance requires that a master plan identify all "[f]uture needs/capital improvements." (Res.-App'x_0004). Edgewood's application, which sought a permit to install eighty-foot stadium lights, describes 'capital improvements.' (R.58, ¶105). *Swanson v. Nelson*, No. 96-1693, 1997 WL 64318, *2 (Wis. Ct. App. Feb. 18, 1997) (quoting *United States Fire Ins. Co. v. E.D. Wesley Co.*, 105 Wis. 2d 305, 309, 313 N.W.2d 833 (1982) (describing a capital improvement as "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money" to "make the property more useful or valuable").

Edgewood reiterates its argument made elsewhere in its brief that its Master Plan is not the applicable code requirement to which its application had to conform. (Br., 67). As explained above, *supra* 17-32, Edgewood is incorrect.

Next, Edgewood argues that it must have been in compliance with all applicable zoning and building code requirements because Tucker wrote a letter stating his belief that an electrical permit for the lights could potentially be issued if the plans complied with MGO §10.085, but in the same letter noted that Edgewood's request "would conflict with the approved 2014 Master Plan". (R.45, ¶92). Edgewood also argues that its lighting application had been marked "approved" by a City Building Inspector. (R.45, ¶95).

However, Tucker's letter that Edgewood could potentially receive an electrical permit but could not actually *use* that permit without violating its Master Plan, was corrected by the Building Inspection Director, who properly determined that even pulling the permit violated Edgewood's Master Plan. Hank determined that M.G.O. §10.085(1) required installation of outdoor lighting to be in conformance with not only §10.085, but all other codes and regulations. (R.45, ¶98). Hank believed that the language of Edgewood's Master Plan was inconsistent with its lighting application and was concerned that allowing Edgewood to make a large capital expenditure to install lights that could not be used put the City at risk. (R.45, ¶¶99-101). The City explained to Edgewood that a permit would not be issued and why. (R.45, ¶103).

Accordingly, Edgewood essentially argues that the City was estopped from reversing course and denying the permit based on the application's nonconformity with zoning provisions. But whether the lighting application was erroneously marked approved does not answer the essential question of whether the application was fully compliant with the zoning laws in effect at the time of the application. Indeed, even if a permit is actually *issued*, which never occurred here, a landowner may *still* not obtain vested rights if the permit application was not compliant with zoning. *See Meinholz*, 2022 WI App 30, ¶83 ("'Issuance of [a] … permit which violates [zoning] ordinance not only is illegal per se, but is injurious to the interests of property owners and residents of the neighborhood adversely affected by the violation.") (quotation omitted); *City of Milwaukee v. Leavitt*, 31 Wis. 2d 72, 78, 142 N.W.2d 169 (1966) (city not estopped from revoking wrongfully issued occupancy permit); *Willow Creek Ranch*, 2000 WI 56, ¶49 (erroneous acts of municipal employees do not estop municipality from enforcing zoning ordinances).

Even if estoppel could apply, here, Edgewood also cannot show any detrimental reliance. *See Meinholz*, 2022 WI App 30, ¶73 (identifying elements of estoppel). Edgewood took no actions and expended no funds in reliance on the City's initial erroneous 'approval' of the lighting application, or Tucker's letter. (R.58, ¶¶114-115).

Edgewood pivots, arguing that it relied on the City's "confirmation" from an informal meeting to table its Master Plan amendment. (Br., 69). But the actions that Edgewood points to for estoppel is Tucker's letter and the City's erroneous

'approval.' It is undisputed that Edgewood tabled its amendment *before* it ever received Tucker's letter or the City's erroneous 'approval.' (SApp.019, ¶94). Thus, those actions cannot and did not cause Edgewood's tabling of its amendment.

Moreover, even if that were not so, Edgewood's tabling of its amendment did not cause Edgewood harm. Edgewood did not table that amendment because of any City action but because it did not believe the amendment, which required Plan Commission and Common Council approval, would pass. (SApp.018, ¶90). Further, there is nothing that prevented Edgewood from continuing with its amendment while also pursuing a lighting application. The two were not mutually exclusive.

Finally, Edgewood argues that "state courts have not expounded upon how to confirm the applicable zoning and building code requirements at the time of submittal," and that this Court should certify that to the Wisconsin Supreme Court. (Br., 70). Edgewood erroneously suggests that the City changed its requirements after it submitted its lighting application, but the Master Plan was an enacted zoning ordinance and in effect. Neither a City employee's informal conversation nor a letter changed that. There is nothing to certify.

## CONCLUSION

Defendants-Appellees respectfully request that this Court affirm the District Court's decision.

DATE:     May 1, 2023.

*/s/ Sarah A. Zylstra*
Sarah A. Zylstra
 *Counsel of Record*

53

Tanner G. Jean-Louis
Boardman & Clark LLP
1 South Pinckney Street
Suite 410
P.O. Box 927
Madison, WI 53701-0927
(608) 257-9521
szylstra@boardmanclark.com
tjeanlouis@boardmanclark.com
*Counsel for Defendants-Appellees*

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)(7)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) as modified by Circuit Rule 32 because this brief contains 13,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), as modified by Circuit Rule 32, and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 13-point Century Schoolbook font in the body and 11-point Century Schoolbook Font in footnotes.

DATED:  May 1, 2023.

<div style="margin-left:40%">

BOARDMAN & CLARK LLP
By

*/s/ Sarah A. Zylstra*
Sarah A. Zylstra
  *Counsel of Record*
Tanner G. Jean-Louis
BOARDMAN & CLARK LLP
One South Pinckney Street
Suite 410
P.O. Box 927
Madison, WI  53701-0927
(608) 257-9521
szylstra@boardmanclark.com
tjeanlouis@boardmanclark.com
*Counsel for Defendants-Appellees*

</div>

## CERTIFICATE OF SERVICE

I certify that, on May 1, 2023, I electronically filed the brief of Defendants-Appellees with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered counsel of record. All parties have consented to receive electronic service and will be served by the ECF system.

I further certify that, on May 1, 2023, I emailed a copy of the brief of Defendants-Appellees upon:

> Jonathan Ingrisano
> Godfrey & Kahn, S.C.
> 833 East Michigan Street
> Suite 1800
> Milwaukee, WI 53202
> Email: jingrisa@gklaw.com

DATED: May 1, 2023.

BOARDMAN & CLARK LLP
By

*/s/ Sarah A. Zylstra*
Sarah A. Zylstra
 *Counsel of Record*
Tanner G. Jean-Louis
BOARDMAN & CLARK LLP
One South Pinckney Street
Suite 410
P.O. Box 927
Madison, WI 53701-0927
(608) 257-9521
szylstra@boardmanclark.com
tjeanlouis@boardmanclark.com
*Counsel for Defendants-Appellees*

\\msnfs2\share\docs\WD\25981\424\A4879687.DOCX

No. 23-1175

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____

EDGEWOOD HIGH SCHOOL OF THE SACRED HEART, INCORPORATED,

*Plaintiff-Appellant*,

v.

CITY OF MADISON, WISCONSIN, CITY OF MADISON ZONING BOARD OF APPEALS,
CITY OF MADISON PLAN COMMISSION AND
CITY OF MADISON COMMON COUNCIL,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the Western District of Wisconsin
The Honorable William M. Conley, Presiding
Case No. 3:21-cv-00118-wmc

_____

## APPENDIX TO BRIEF OF DEFENDANTS-APPELLEES

_____

<div align="right">

Sarah A. Zylstra
 *Counsel of Record*
Tanner G. Jean-Louis
BOARDMAN & CLARK LLP
1 South Pinckney Street
Suite 410
P.O. Box 927
Madison, WI 53701-0927
(608) 257-9521
szylstra@boardmanclark.com
tjeanlouis@boardmanclark.com
*Counsel for Defendants-Appellees*

</div>

May 1, 2023

## TABLE OF CONTENTS

**Description**                                                                         **Page**

Madison General Ordinance § 28.097 (R.40-3).........................................Res.App'x_0001

Madison General Ordinance § 10.085 (R.40-18)......................................Res.App'x_0007



(1) <u>Statement of Purpose</u> .

The CI District is established to recognize the City's major educational and medical institutions as important activity centers and traffic generators, accommodate the growth and development needs of these institutions, and coordinate the master plans of these institutions with the City's plans, policies and zoning standards. The district is also intended to:

(a) Permit appropriate institutional growth within boundaries while minimizing the adverse impacts associated with development and geographic expansion.

(b) Balance the ability of major institutions to change and the public benefits derived from change with the need to protect the livability and vitality of adjacent neighborhoods.

(c) Encourage the preparation of Campus Master Plans that enable adjacent neighborhoods and the broader community to understand the levels of development being proposed, their likely impacts, and appropriate mitigation measures.

(2) <u>Master Plan Requirement</u> .

(a) Any Campus-Institutional District created after the effective date of this ordinance shall submit a Campus Master Plan, which shall be approved as part of the map amendment.

(b) Approved Campus Master Plans shall be effective for ten (10) years, and, during that period, may be altered pursuant to sub. (8) below.

(c) In a Campus-Institutional District without a Campus Master Plan, the construction of a new building or additions to existing buildings that exceed four thousand (4,000) square feet in floor area on a zoning lot within any five (5) year period shall require conditional use approval. (Am. by ORD-15-00033, 4-8-15)

(d) In a Campus-Institutional District without a Campus Master Plan, the establishment, improvement, or modification of any primary or secondary use occurring outside of an enclosed building shall require conditional use approval. However, the Zoning Administrator may issue permits to repair or replace any existing facility related to a primary or secondary use provided that the proposed facility is of a similar bulk condition and at a similar location on the zoning lot as the existing facility.

(e) In the absence of a Master Plan, dimensional requirements are in sub. (4) below.

(f) Any PD converting to CI carries the land use approval and restrictions from the PD into the CI, and those rules and agreements are in full effect until a Campus Master Plan is adopted.

(Am. by <u>ORD-19-00069</u> , 10-10-19)

(3) <u>Uses Within CI Districts</u> . Uses within CI districts are defined as follows as either primary or secondary. All secondary uses must be utilized predominantly in a manner that is directly related and complementary to the institution's primary uses.

(a) <u>Primary Uses</u> .

1. Educational uses associated with colleges, universities, and secondary and primary schools, including classroom buildings, libraries, and offices.

2. Medical facilities, including hospitals, clinics, laboratories and related facilities.

3. Dormitories, student and/or faculty housing.

    4. Community Center.

    5. Places of Worship.

(b) <u>Secondary Uses</u> .

    1. Day care facilities.

    2. Eating places within mixed-use buildings such as dormitories or student unions.

    3. Fraternities and sororities.

    4. General retail, financial and personal service uses within mixed-use buildings such as student unions.

    5. Indoor and outdoor sports and recreational facilities.

    6. Lodging facilities.

    7. Museums and art galleries.

    8. Parking, structured and surface.

    9. Performing arts centers.

    10. Utilities and transportation facilities related to the primary use.

    11. Veterinary clinics.

    12. Agricultural uses.

    13. Public utility and service uses.

    14. Other uses related to the institution's primary mission.

    15. Correctional Facility.

    16. Stadiums, auditoriums, and arenas, open or enclosed.

(Am. by <u>ORD-19-00069</u> , 10-10-19)

(4) <u>Dimensional Requirements</u> .

In CI districts, with an approved Master Plan, dimensional requirements will be determined by the Master Plan. In CI Districts with no Master Plan, the dimensional requirements follow. Requirements represent minimums unless otherwise noted. Dimensions are in feet unless otherwise noted.

| Campus-Institutional District | |
|---|---|
| Lot area sq. ft. | 6,000 |
| Lot width | 50 |

| Front yard setback | 0' or 5'<br><br>0' if the distance between the curb and property line is equal to or greater than 15'. A no-build easement may be used to achieve the 15' distance.<br><br>5' if the distance between the curb and property line is less than 15'. |
|---|---|
| Side yard setback | 0' or 5'<br><br>0' if the distance between the curb and property line is equal to or greater than 15' or shown on the Setback Exceptions Map. A no-build easement may be used to achieve the 15' distance.<br><br>5' if the distance between the curb and property line is less than 15'.<br>See (a) below and Downtown Setback Map and Setback Exceptions Map. |
| Rear yard setback | 0 |
| Maximum lot coverage | 85% |
| Maximum height | 3 stories/68<br>See Sub. (a) below |
| Usable open space | 0 |

(Am. by ORD-14-00002, 1-14-14; Am. by ORD-21-00028 , 3-30-21, Eff. 4-9-21)

    (a) Heights exceeding the maximum may be allowed with conditional use approval. (Cr. by ORD-14-00002, 1-14-14)

  (5) <u>Contents of Master Plan</u> .

    The Master Plan shall include the following elements and information:

    (a) <u>Background/History</u> . A summary of previous planning efforts by the institution in conjunction with the City and/or abutting neighborhoods or other interest groups, a description of the campus master

(b) <u>Mission/Guiding Principles</u> . A statement that defines the organizational mission and objectives of the institution and describes the role of the master plan within the context of the mission.

(c) <u>Facilities Plan</u> . Includes a description of existing conditions on the campus and the proposed conditions under the Master Plan, including:

    1. <u>Existing Conditions</u> .

        a. Land uses and buildings.

        b. Building form (building type, height, bulk, etc.).

        c. Landmarks, historic sites and districts.

        d. Natural features and significant open-space areas.

    2. <u>Proposed Conditions</u> .

        a. Future needs/capital improvements.

        b. Phasing of proposed improvements.

        c. Future land uses and buildings.

        d. Building Form (building type, height, bulk, etc.).

        e. Landscape treatment.

        f. Open-space areas and other open-space uses.

        g. Relationship to transportation/access plan (parking, transportation demand management, etc.).

(6) <u>Standards for Master Plan Approval</u> .

The Common Council will approve or reject the Master Plan following a recommendation by the Plan Commission. Approval of the Master Plan will be based on the Plan's treatment of the topics listed above and the degree to which it meets the intent of this district, as well as the following standards:

(a) The Plan shall serve the public interest as well as the interest of the institution developing the plan.

(b) The Plan shall be consistent with the goals of the Comprehensive Plan and adopted neighborhood, corridor or special area plans adjacent to campus boundaries.

(7) <u>Final Building, Structured Parking, and Surface Parking Design Review</u> .

(a) All Campus Master Plans shall identify building location and maximum height. All buildings properly identified on a Campus Master Plan must be reviewed and approved by an architectural review committee prior to construction. The committee shall be established by the institution and shall meet the following standards:

    1. The building design review standards and guidelines, review procedures, categories of membership, and the language of any deed or plat restriction must be approved by the Urban Design Commission.

    2. Membership on the committee, including representation of planning staff and registered neighborhoods, and committee procedures must be approved by the Plan Commission. Committee meetings shall be public.

3. Until an architectural review committee is established and approved by the Plan Commission, all buildings shall be reviewed and approved by the Urban Design Commission, with an appeal process to the Plan Commission established in Section 33.24.

(b) In addition to undergoing the design review process in sub. (7)(a) above, and in order to minimize impact on City right-of-ways, all structured or surfaced parking facilities properly identified in a Campus Master Plan must be reviewed by the Transportation Commission and Board of Public Works and approved by the Common Council prior to construction. In approving a structured or surface parking facility under this section, the Common Council may require a Traffic Impact Analysis (TIA) prepared by the applicant, a permanent right-of-way dedication to the city, and/or city right-of-way improvements, if deemed necessary by a Traffic Impact Analysis or an analysis prepared by the City Traffic Engineer. Any such analysis shall consider the cumulative effect of other structured and surface parking facilities in the area when determining whether a permanent right-of-way dedication or right-of-way improvement is necessary. (Am. by ORD-19-00081 , 11-13-19)

(c) If there is no approved Master Plan, building design review will occur as part of the conditional use approval.

(Am. by ORD- 17-00073 , 7-26-17)

(8) Review by University of Wisconsin-Madison Campus Area Committees Prior to Final Building Design Review .

Prior to presenting final building design to the architectural review committee under Sub. (7) above, the University of Wisconsin-Madison shall present the final building design plans to a meeting of the Joint West and Joint Southeast area review committees after giving notice of the joint meeting by first class mail to the owners of record, as listed in the office of the City assessor, and occupants of multi-tenant buildings, of property in whole or in part situated within two hundred (200) feet of the boundaries of the properties affected.

(Cr. by ORD- 17-00084 , 9-13-17)

(9) Appeal of Decision by Architectural Review Committee .

The applicant or alder for the affected district may appeal any decision of the architectural review committee under Sub. (7) above to the Plan Commission. Appeal may be taken by filing a Notice of Appeal with the Secretary of the Plan Commission within 10 days of a final decision by the architectural review committee. The appeal should state the reasons for appeal and relief sought by the applicant or alder. Once an appeal is received, the Plan Commission shall set a public hearing as soon as practicable. At the conclusion of the public hearing, the Plan Commission may affirm, reverse, or modify the decision of the architectural review committee.

(Cr. by ORD- 17-00084 , 9-13-17)

(10) Changes to Master Plan .

No alteration of an approved Campus Master Plan, including changes to the proposed use of identified open space areas and other open space uses, shall be permitted unless approved by the Plan Commission, provided however, the Zoning Administrator may, following consideration by the

alderperson of the district. Issue permits for minor alterations that are approved by the Director of Planning and Community and Economic Development and are consistent with the concept approved by the Common Council. If the change or addition constitutes a substantial alteration of the original plan, the procedure in Sec. 28.097(6) is required.

(Renum. by ORD- 17-00084 , 9-13-17)



(1) <u>Purpose and Intent</u>. This ordinance regulates all outdoor lighting installed on residential site and commercial site property, both publicly and privately owned within the City of Madison with the exception of outdoor lighting on public streets, public bikeways and public walkways which are regulated elsewhere in the ordinances. The purpose of this ordinance is to create standards for outdoor lighting that do not interfere with the reasonable use of commercial site and residential site property, that prevent light trespass and conserve energy yet maintain night time safety. Installation of outdoor lighting is not mandatory but if installed, it shall be in conformance with the provisions of the ordinance, the building code and all other codes and regulations as applicable and under appropriate permit and inspection.

(2) <u>Definitions</u>.

<u>Commercial Site</u> shall mean a tract consisting of one or more contiguous lots or parts of lots which are to be used for interdependent ingress and egress of vehicles and containing one or more off-street loading or parking facilities or any commercial site having five (5) or more parking stalls.

<u>Covered Parking Facilities</u> shall mean a parking facility with an overhead covering and shall include all floors except the roof level of a multilevel parking structure or ramp.

<u>Driveway</u> shall mean every way or area used for vehicular travel back of the street right-of-way line.

<u>Footcandle</u> shall mean the illumination of a surface one foot distant from a source of light equivalent to one candle.

<u>Building Inspection Division</u> shall mean the Building Inspection Division of the City Department of Planning and Community and Economic Development. (Am. by ORD-08-00109, 10-7-08

<u>Installation</u> shall mean the attachment or assembly, whether or not connected to a power source, of any outdoor light fixture affixed to the ground, a building, a pole or any other supporting structure or device.

<u>Light Trespass</u> shall mean stray light or spill light flowing across the property boundary. (Am. by Ord. 13,717, 10-26-04)

<u>Lighting Sources</u> shall mean any lamp or manufactured device emitting energy that is capable of exciting the retina and producing a visual sensation. The energy emitted shall fall within the electromagnetic spectrum to a length of between 380 and 770 nanometers. Such devices shall include, but are not limited to, incandescent, fluorescent, carbon arc, quartz-iodine/tungsten halogen, low pressure sodium, high pressure sodium, metal halide and mercury vapor lamps.

<u>Non-Shielded or Non-Cutoff Lighting Fixtures</u> shall mean all types of outdoor lighting fixtures other than shielded or cutoff lighting fixtures and includes any lighting fixture that employs an adjustable bracket, refractorizing glassware or lenses, a non-shielded lamp or light source and distributes light at any angle more than four degrees (4°) above horizontal. (Am. by Ord. 13,717, 10-26-04)

<u>Open Parking Facilities</u> shall mean a parking facility without an overhead covering and shall include the roof level of a multilevel parking structure or ramp.

<u>Outdoor Canopy</u> shall mean a free-standing roof structure without side walls which may or may not be attached to the roof of an adjacent building and which shall include but shall not be limited to canopies over gas station pumps or canopies at convenience stores.

Outdoor Lighting Fixtures shall mean lighting sources whether emitting power-using devices, lighted or reflective surfaces, lamps and similar devices, permanently installed or portable, used for illumination or for advertisement. Such devices shall include, but are not limited to, searchlights, spotlights, floodlights, streetlights, sign lights, security lights, wall lights, porch lights, area lights, parking area lights, sports lights and sign panels.

Outdoor Merchandizing Area shall mean car sales lots, equipment sales lots, retail gasoline stations, garden centers, and other similar areas where products are permanently displayed or dispensed outdoors.

Person shall mean any individual, tenant, lessee, owner, operator, or any public, private, nonprofit, or commercial entity including but not limited to, firm, business, partnership, joint venture, association, corporation, municipality, agency or governmental agency.

Residential Site shall mean a single parcel in a residential zone containing a residential structure of one or more dwelling units with a parking facility for one (1) or more cars. (Am. by Ord. 13,717, 10-26-04)

Shielded or Cutoff Lighting Fixtures shall mean outdoor lighting fixtures that utilize flat, clear lenses with no refractorizing elements and which operate in a horizontal position with nonadjustable mounting hardware or brackets. Such fixtures distribute light by means of an internal reflector only. The light source is totally concealed by the fixture housing when the position of observation is at an angle less than fifteen degrees (15°) above horizontal. No light is permitted at an angle more than four degrees (4°) above horizontal. (Am. by Ord. 13,717, 10-26-04)

Uniformity Ratio shall mean the ratio between the average illumination and the minimum illumination as determined by measurements taken on a four-foot grid throughout the area to be lighted.

(3) General Requirements .

    (a) All outdoor lighting fixtures installed and thereafter maintained upon private or public residential, commercial, industrial and other nonresidential property shall comply with the following:

        1. The maximum allowable light trespass shall be 0.5 horizontal footcandles four (4) feet above the ground. The point of measurement of this offending light shall be at any point at the outer wall of an adjacent building occupied for residential or public use, or at any point greater than 10 feet from the adjacent lot line. This measurement shall not include any ambient, natural light.

        2. All fixtures greater than 1,000 initial lumens (equivalent to 70 watts incandescent) shall be full cutoff, or shall be shielded or installed so that there is not a direct line of sight between the light source or its reflection and a point five (5) feet or higher above the ground at the property boundary. The light source shall not be of such intensity so as to cause discomfort or annoyance.

        3. Any outdoor lighting fixture installed on a parking lot, parking structure or outdoor merchandizing area shall use either high-pressure sodium, metal halide, fluorescent lamps, or any other lamps that produce thirty (30) or more lumens per watt. The lighting system shall be extinguished or reduced to fifty percent (50%) no later than thirty (30) minutes after the close of business for the day or after the end of normal office hours for the majority of employees. (Am. by ORD-07-00032, 3-22-07; ORD-15-00060, 6-10-15)

        4. All lamp types utilized for search lighting and/or spot lighting for advertising purposes shall not be operated past 11:00 P.M.

    (b) All outdoor lighting fixtures installed prior to March 30, 1993 shall be exempt from this ordinance except as follows:

or changes in existing outdoor lighting fixture system is proposed t

(50%) or more of the total number of fixtures, then all fixtures shall comply with the provisions of this or

2. All outdoor lighting fixtures installed on residential parking facilities irrespective of installation date shall conform to subsection (4)(c) herein.

(c) All outdoor lighting fixtures shall be maintained according to approved plans.

(d) Trees and shrubbery shall not be located where they significantly reduce or block the lighting of parking facilities or roadways.

(e) Outdoor lighting fixtures may be used to illuminate buildings and structures; recreational areas, sports fields and courts; parking lots; parking structures, garages, or ramps; landscape areas; outdoor merchandizing areas; building overheads and open canopies. Outdoor lighting fixtures may be installed to provide building and parking lot security.

(Am. by Ord. 13,717, 10-26-04)

(4) Specific Design Requirements .

(a) A lighting system for parking facilities and outdoor merchandizing areas in commercial, industrial, agricultural and recreational areas shall be designed to provide the lighting intensities and uniformities described as follows:

1. Open Parking Facilities . The illumination requirements of an open parking facility depend on the amount of usage the facility receives. Three levels of activity shall be established as High, Medium and Low, reflecting both traffic and pedestrian activity. The following examples are nonexclusive and include:

   a. High Activity : Facilities for major or league athletic events or major cultural or civic events.

   b. Medium Activity : Shopping centers, retail parking areas, hospital and clinic parking areas, transportation parking (airports, commuter lots, etc.), cultural, civic or recreational events, and fast food facilities.

   c. Low Activity : Employee parking, educational facility parking, office parks and church parking.

2. Horizontal Illuminances for Parking Facilities .

   a. Open Parking Facilities .

| General Parking & Pedestrian Area | | | | | Vehicle Use Area (Driveway) | | |
|---|---|---|---|---|---|---|---|
| Level of Activity | Min. Footcandles [1] on Pavement | Max Avg Footcandles on Pavement | Max Uniformity Ratio [1] (Avg:Min) | Max. Watts [3] /Sq Foot Lighting Load [2] | Minimum Footcandles [1] on Pavement | Max Avg Footcandles on Pavement | Maximum Uniformity Ratio [1] (Avg:Min) |
| High | 0.6 fc | 3.75 fc | 5:1 | .12 | .67 fc | 2.5 fc | 5:1 |
| Med | 0.4 fc | 2.5 fc | 5:1 | .10 | .33 fc | 1.5 fc | 5:1 |

| Low | 0.2 fc | 1.5 fc | 5:1 | .08 | .125 fc | 1.0 fc | 5:1 |

(Sec. 10.085(4)(a)2.a. Am. by Ord. 11,392, Adopted 11-7-95)

      b.  Covered Parking Facilities .

| Areas | Minimum Footcandle Average on Pavement | Minimum Footcandles on Pavement | Maximum Average Footcandles on Pavement | Maximum Uniformity Ratio (Avg:Min) | Maximum Watts [3] /Sq Ft Lighting Load |
|---|---|---|---|---|---|
| General Parking and Pedestrian Areas | 5 fc | 1.25 fc | 9 fc | 4:1 | .2 |
| Private Controlled Entry Parking | 3 fc | .75 fc | 6 fc | 4:1 | .2 |

[1] Not mandatory within 4 feet of the pavement edge.

[2] Not mandatory for driveways.

[3] Watts shall mean lamp wattage and ballast consumption.

    (b)  An outdoor lighting system for illuminating buildings and structures shall have a maximum connected lighting load of five (5) watts per lineal foot. Watts shall mean lamp wattage and ballast consumption. Such lighting shall be shielded or installed so as to illuminate the building, and not the sky.

    (c)  A parking facility for more than three (3) cars on a residential site shall be lighted to provide at least .25 footcandles on any surface with an average illumination level of at least .75 footcandles. Outdoor light fixtures shall be designed and installed to minimize light trespass. In addition, the uniformity ratio between the average illumination and minimum illumination shall be no greater than 4:1. (Am. by ORD-05-00055, 4-6-05)

    (d)  For an outdoor merchandizing area, the maximum initial illumination level in 75% of the lot shall not exceed 20 footcandles. A contiguous area not to exceed 25% of the lot may be illuminated to a level which shall not exceed 40 footcandles.

    (e)  The maximum initial illumination level under an outdoor canopy shall not exceed 50 footcandles at any point.

(Am. by Ord. 13,717, 10-26-04)

(5) Appearance.

  (a)  Any person desiring to install outdoor lighting fixtures greater than 1,000 initial lumens shall submit to the Building Inspection Division for review the following materials:

    1.  A catalog page, cut sheet or photograph of the lighting fixtures including the mounting method.

    2.  A photometric data test report of the proposed lighting fixture graphically showing the lighting distribution in all angles vertically and horizontally around the fixture.

    3.  A plot plan showing the location of all outdoor lighting fixtures proposed, the mounting or installation height, the overall initial illumination levels and uniformities and the point where 0.5 horizontal footcandles occurs on the property or adjacent property at a distance four (4) feet above the ground. This may be accomplished by means of an isolux curve or computer printout projecting the illumination levels.

    4.  A graphic depiction of the lighting fixture's lamp concealment and light cutoff angles.

(Am. by Ord. 13,717, 10-26-04; ORD-08-00109, 10-7-08)

  (b)  Upon review of the material described above, the Building Inspection Division may authorize the installation of outdoor lighting fixtures. (Am. by ORD-08-00109, 10-7-08)

(6) Administrative Exemption.

  (a)  Any person may submit a written request to the Building and Fire Code Review and Appeals Board for an administrative exemption from the requirements of this ordinance. The basis for an administrative exemption shall be any one or more of the following reasons: the provisions of the ordinance do not fully apply; the application of the ordinance may cause a manifest injustice to be done; the compliance time required for compliance with the ordinance is unreasonable; an alternate plan for outdoor lighting is equally good or better than standards set by the ordinance. The request shall state fully the circumstances and conditions relied upon as the basis for an administrative exemption and shall be accompanied by plans and legal description of the property involved. In addition, the request shall contain the following information:

    1.  Name, address and telephone number of the applicant.

    2.  Location of the outdoor lighting fixtures for which the exemption is requested.

    3.  The nature of the circumstances which necessitate the exemption.

    4.  Use of the outdoor lighting fixture involved.

    5.  All description data as called for in subsection (5) herein.

    6.  Such other data and information as may be required by the Board.

  (b)  In considering whether to grant the request for an administrative exemption from the ordinance, the Building and Fire Code Review and Appeals Board may consider the following factors:

    1.  Special circumstances or conditions applying to the land, building or outdoor lighting fixture for which the exemption is sought;

    2.  Deprivation to the applicant of the reasonable use of the land, buildings or outdoor lighting fixtures that strict application of the ordinance may cause;

    3.  The effect of the granting of the exemption on the public welfare.

(7) Penalties. Any person violating the provisions of this ordinance shall be fined not less than twenty-five

Res.App'x_0011

dollars ($25) nor more than three hundred dollars ($300). Each day's continued violation shall constitute a separate offense.

(Sec. 10.085 Cr. by Ord. 10,631, Adopted 3-30-93)